**VINSON & ELKINS, Appellant,**

v.

**Ann MORAN and Jim Poinsett, Individually and as Assignees, and Patrick J. Moran, Appellees.**

No. 14–95–00348–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 27, 1997.

Rehearing Overruled June 12, 1997,

David E. Keltner, Fort Worth, Richerd H. Caldwell, Leslie C. Taylor, Thomas M. Farrell, Laura J. Ware Doerre, David M. Gunn, Houston, for appellants.

Patrick J. Moran, Houston, Paul E. Knisely, Broadus A. Spivey, Thomas Paul Prehoditch, Austin, for appellees.

Before MURPHY, C.J., and YATES and FOWLER, JJ.

## OPINION

MURPHY, Chief Justice.

This is a legal malpractice case. Appellees Ann Moran and Jim Poinsett, individually and as assignees, sued Vinson & Elkins (V & E), appellant, alleging professional negligence (legal malpractice), breach of fiduciary duty, conspiracy, and violations of the Texas Deceptive Trade Practices Act (DTPA). The claims in this case arose out of V & E's alleged misconduct and mishandling of legal matters in connection with the administration of the Estate of W.T. Moran (the Estate). Following a jury verdict in favor of Ann Moran and Jim Poinsett, individually and as assignees, the trial court entered a judgment in excess of $35 million. V & E prosecutes this appeal and in fifty points of error, asks this court to reverse the judgment. Patrick J. Moran (Pat or Pat Moran) raises a conditional cross-point of error asking this court to reverse and remand to allow him the opportunity to prosecute any claims he might have against V & E. His cross-point is conditioned on this court's determining the assignments were invalid. We reverse and render in part, and reverse and remand in part.

## I. FACTUAL BACKGROUND

W.T. Moran, an oil and gas mogul, died November 30, 1983.[1] He left an estate worth $85 to $100 million. The estate consisted of family businesses including Moran Utilities, a gas supplier, Morgas Pipeline Corporation (Morgas), a gas pipeline company, Glen Rose, an oil and gas company, as well as large real estate and stock holdings. W.T. Moran left his estate to numerous beneficiaries, some in trust, in varying percentages:

(1) widow, Louise J. Moran, 26%, free of estate taxes;

(2) daughter, Betty Ann Franke, 24%, in trust for life;

(3) grandson, Patrick J. Moran, 20%, trust terminated;

(4) grandson, Michael R. Moran, 7.6%, in trust to age 45;

(5) Moran Employees' Trust, 6.06%, remainder interest to St. Joseph's Hospital;

(6) granddaughter, Ann Moran, 3.07%, trust terminated;

(7) grandson, W.T. Moran, III, 3.07%, trust terminated;

(8) Susan J. Moran McDonough, 3.07%, in trust to age 45;

(9) Leroy Poinsett Children's Trust, 2.03%;

(10) Margaret Ann Brougher Dell'Osso, 1.54%, in trust;

(11) Mae G. Shapley, 1.02%;

(12) Father N. Arthur Besse, S.J., 1.02%;

(13) Marie Byrne, 1.02%, in trust;

(14) nephew, Jim Poinsett, .5% in trust.

W.T. Moran's will designated three co-executors: Pat Moran; John McDonough (McDonough), Susan J. Moran McDonough's husband; and First City National Bank (the Bank). W.T. Moran's probate counsel was the firm of Hirsch & Westheimer. That firm prepared the last will and testament and was designated as the primary counsel for the Estate. In 1984, several issues arose concerning the proper construction of the will. The Bank hired V & E to file a will construction suit in March of 1984. V & E raised questions about whether Hirsch & Westheimer had erred in the wording of some of the language in the will; specifically the marital deduction to Louise J. Moran. Because this specter of legal malpractice might require Mark Westheimer to testify in the suit, Hirsch & Westheimer withdrew from representation of the Estate. The suit was ultimately resolved by a "friendly suit" agree-

---

1. Our initial presentation of the facts is not exhaustive. We are simply attempting to set the scene and will discuss the facts in more detail within the relevant points of error, if and when necessary.

ment among the beneficiaries in October of 1985. After Hirsch & Westheimer withdrew, the Estate's legal work was assumed by V & E.

The facts from this point forward are in dispute. Appellees claim Pat Moran was W.T Moran's choice to preserve and manage the Moran businesses. They contend a majority of the Estate beneficiaries wanted to retain the Moran companies and wanted to distribute and close the Estate as soon as possible with that end in mind. Appellees say Pat Moran "tried valiantly" to do that and was supported in his efforts by Louise Moran, Ann Moran, Bill Moran, Jim Poinsett, the Moran employees, and "much of the time" by other beneficiaries. They also suggest that any dispute among the beneficiaries or between the beneficiaries and the executors was caused by the Bank, a V & E client, and its representative Tim Blair.

According to V & E, it was not support, but rather battle lines that existed between many of the beneficiaries. V & E claims the evidence shows that Pat Moran attempted to gain control of the Estate and wanted to keep the Moran businesses together in such a way that he would dominate those businesses. V & E contends that many beneficiaries were opposed to the actions Pat Moran was taking and that there was much infighting and revolt among the beneficiaries.

The thrust of the complaints in this suit concerns V & E's alleged failure to reveal conflicts of interest and to act in the best interest of the Estate rather than its own interest. According to appellees, dozens of V & E attorneys worked on the Estate. The principal attorneys were Don Wood (Wood), Boone Schwartzel (Schwartzel), and Jay Cuclis (Cuclis). Wood, Cuclis, and another V & E attorney, George Gerachis (Gerachis) allegedly befriended Pat Moran and a social relationship developed between these men. Appellees claim Wood was in charge of ethical standards related to the Estate, but he, along with Schwartzel and Cuclis, claimed a lack of familiarity with V & E's conflicts manual or the firm's computer system, which was used to check conflicts. According to Wood, each V & E attorney handled conflicts of interest as he or she saw fit.

Appellees assert that V & E's policy manual discouraged disclosure of conflicts of inter-est to clients and suggested that concerns about conflicts be discussed with J. Evans Attwell (Attwell), the firm's managing partner. Appellees argue the conflicts system used, if at all, by V & E was inadequate because it referenced only representational conflicts, but did not list any of the firm's or any individual attorney's interests, e.g., directorships, stock holdings, or proprietary and financial interests. Appellees claim Attwell was actively involved in the firm's representation of the Estate and frequently consulted with the principal attorneys involved in the representation.

Appellees assert that, eventually, numerous conflicts of interest were discovered, conflicts that had not been revealed by V & E and that affected major Estate transactions. Several of these conflicts involved W.J. Wooten (Wooten), who was hired as president of the Moran Corporation in 1984, after the Bank recommended Wooten to Pat Moran and McDonough. Wooten involved a Moran company in a $3.2 million oil and gas venture with HOFCO, a company in which Wooten was a board member. Cuclis allegedly worked on some of the documentation for the venture. HOFCO had serious financial problems and the Bank had loaned the company approximately $5 million. V & E allegedly represented both HOFCO and the Bank in the loan transaction and still represented HOFCO in other matters. Further, V & E owned stock in HOFCO as did individual firm attorneys.

Wooten also tried to involve the Moran Companies in a transaction with Entex. After he had a confidential conversation with Entex about Moran Utilities, Wooten and the Bank urged the Estate to contact Entex to discuss the possibility of a sale. Eventually, Entex made an offer, but several of the Moran family members formed a group and stated it would top all Entex offers. V & E represented the Estate in the negotiations and billed for the work. Although many of the beneficiaries knew the Bank favored the sale to Entex since it was a large Bank customer, they eventually learned that the Bank made credit advances to Entex to allow the purchase. Attwell denied V & E had any relationship with Entex; however, according to appellees, Pat Moran found a limited part-

nership agreement, entered into before the Entex negotiations even began, in which the V & E Lawyers Retirement Plan and the Bank's pension trust are partners whose stated purpose is to buy Entex properties and lease them back to Entex.

Eventually, appellees learned that Wooten was recommended to the Bank by Cuclis' supervisor at V & E. According to appellees, Wooten's tenure as president was a disaster and he cost the Estate a great deal of money. Wooten was eventually terminated.

Appellees presented evidence of other alleged conflicts that V & E did not disclose. V & E's plan for closing the Estate included the sale of Moran companies. The companies were to be sold to pay Estate taxes. The Moran family group still did not want to sell, but everyone agree that if the companies were to be sold, a competitive bid system should be used. A bid system was set up for the purchase of Morgas and Moran Utilities. Offers were made by two companies, Seagull and Thrash, and a group of Moran family members. Some of the Moran beneficiaries heard a rumor about a possible transaction between Seagull and Morgas. Ann Moran investigated the rumor that the sale was "in the bag" and would "fall in the lap" of Seagull and the "senior partner" of V & E. When she asked about it however, she was told there was nothing to it. Later, Seagull and its undisclosed partner, Entex, made a bid for the companies. V & E allegedly wanted to represent the Estate in the transaction and sought a waiver of conflicts from the Estate after disclosing only that Seagull was a firm client. V & E disclosed no other conflicts.

Seagull's offer was allegedly resisted by a majority of the beneficiaries. Pat Moran ultimately filed suit on May 20, 1988, to stop the two other executors, McDonough and the Bank, from making the sale. McDonough and the Bank counter-sued claiming the sale should go forward based on a 2–1 vote of the executors. This suit became known as the "executors' lawsuit." V & E represented to Pat Moran that it would not have any role in the executors' lawsuit; however, from memos obtained by appellees, V & E was involved behind the scenes. V & E recommended

counsel for the Bank and the Bank's counsel was counting on V & E's "cooperation." Despite this, V & E continued to work for the Estate.

Eventually, appellees, through discovery obtained in the executors' suit and inquiries by Ann Moran, discovered numerous ties between V & E, the Bank, and Seagull, which the firm did not disclose. For example, Attwell was on the board and executive committee of Seagull and was actively working for Seagull on the Morgas sale; Seagull officers served on the Bank's board and trust committee; Attwell and another V & E attorney, Harry Reasoner, served on the Bank's board; and many V & E attorneys owned stock in the Bank.

V & E's version of the events differs dramatically from appellees' version. V & E claims that from the day after the funeral, there was conflict between many of the beneficiaries. Pat Moran allegedly admitted that "there was going to be a problem" in managing the Estate because of the adversity that existed. One beneficiary, Betty Franke, believed Pat Moran was attempting to seize control; Michael Moran, Billy Moran, and Susan McDonough allegedly shared this view.

V & E contends Pat Moran's actions were in direct contravention of the wishes of many beneficiaries. V & E claims that because there was insufficient cash in the Estate to pay the required taxes after setting aside Louise Moran's tax-free gift, it suggested a deferral, as allowed under the Internal Revenue Code; however, McDonough, the Bank, and many beneficiaries did not want to defer, but wished to pay the taxes, distribute the assets, and close the Estate as soon as possible. Pat Moran supposedly wanted to keep the deferral as long as possible and attempt to invest the money and pay the taxes without selling the businesses; but, V & E raised the suggestion that the IRS might discontinue the deferral because of certain actions taken by the executors in restructuring the Moran businesses. V & E claims Pat Moran's actions worried McDonough and many beneficiaries because he was "speculat[ing] with the tax money."

V & E claims Pat Moran ostensibly agreed to a prompt closure of the Estate in return

for Wooten's dismissal. Wooten was dismissed and V & E prepared a plan to close the Estate by July 1988. Under the plan of distribution, the Moran companies were to be sold. A copy of the plan was allegedly sent to all of the beneficiaries. There was dissension among the beneficiaries regarding the plan. Some wanted to sell the businesses, pay the taxes, take their share, and close the Estate. Others opposed any sale of the Moran companies. Acting on the plan, the executors, through hired investment bankers, put the companies out for bid; however, according to V & E, Pat Moran blocked the sale of the companies and caused the Estate to remain open. For example, Pat Moran allegedly "torpedoed" a $30 million sale to Thrash saying it was too low, angering other beneficiaries.

V & E contends Pat Moran also blocked a $30 million sale to Seagull when he filed the executors' lawsuit. According to V & E, however, Pat Moran urged the investment bankers to reapproach Seagull during the executors' lawsuit. Following that, Seagull upped its bid to $34 million, in a transaction which called for Seagull to purchase Morgas and for Entex to purchase Moran Utilities. V & E claims Pat Moran authorized the firm to represent the executors on the offer. Ultimately, all three executors signed a contract for Seagull to buy Morgas, and V & E claims Pat Moran signed with full knowledge of the relationship between Seagull, V & E, and Attwell. V & E denies that Attwell was advising Seagull on the sale involving Morgas; however, V & E claims that even after Pat Moran received information that led to his mistaken belief that Attwell was advising Seagull, he still allowed V & E to work on the purchase. After signing the Seagull contract, Pat Moran refused to sign the Entex contract, and thus, the entire sale fell through because the Seagull purchase was contingent upon the Entex purchase. V & E argues that Pat Moran once again managed to block a sale of the companies and delay the closing of the Estate.

After the Seagull negotiations finally died, the executors' lawsuit continued until February 1990. The suit was settled and River Oaks Trust (River Oaks) replaced the original executors. Ultimately, Morgas and Moran Utilities were sold. The executors' lawsuit ended with no liability for any executor and they were all released by the beneficiaries. The attorneys for the executors and beneficiaries were also released, but V & E claims that "Pat and Ann insisted that V & E be carved out of the releases."

Ann Moran believed that the family "should go after" V & E and that there was sufficient evidence to sue the firm. Most beneficiaries did not want to actively participate in a suit against V & E and assigned their claims against the firm to Ann Moran or Jim Poinsett. Pat assigned his claim to Ann Moran. Ann Moran and Jim Poinsett, individually and as assignees, filed suit against V & E on May 16, 1990. According to V & E, this suit merely substituted the firm for the executors and sought, from V & E, damages that arose from the *executors'* administration of the Estate. The suit alleged claims for negligence, DTPA violations, breach of fiduciary duty, and conspiracy. These claims arose out of V & E's alleged misconduct and mishandling of the legal matters in connection with the administration of the Estate. The case was tried to a jury that made findings favorable to Ann Moran and Jim Poinsett. Judgment was entered in favor of Ann Moran and Jim Poinsett, individually and as assignees, and V & E brought this appeal.

## II. ASSIGNABILITY OF LEGAL MALPRACTICE CLAIMS

In its first point of error, V & E contends the assignment of legal malpractice claims are barred as a matter of law, and therefore, Ann Moran and Jim Poinsett may not recover in the capacity of assignees. Appellees disagree, arguing that while some legal malpractice assignments may be banned, others are authorized by statute and supported by policy considerations against misconduct by lawyers. We hold that legal malpractice claims are not assignable.

### A. Statutes and Caselaw

Alienability of choses in action has its roots in equity, not law. *State Farm Fire and Casualty Co. v. Gandy*, 925 S.W.2d 696, 705 (Tex.1996). At early common law, a chose in action, which is defined as a personal right

not reduced into possession, but recoverable by suit at law, was not assignable and no man could purchase in whole or in part another's right to suit.[2] *Reef v. Mills Novelty Co.*, 126 Tex. 380, 89 S.W.2d 210, 211 (Com. App.1936); Francis M. Dougherty, Annotation, *Assignability of Claim for Legal Malpractice*, 40 A.L.R.4th 684, 685 (1985). Soon, however, equity began to recognize the assignment of choses in action. *See Gandy*, 925 S.W.2d at 706. In fact, the only remnants of the rule against alienability of choses in action to survive passage of the common law to America were those pertaining to some torts. *Id.* In 1840, the Congress of the Republic of Texas provided by statute for the assignment of negotiable and non-negotiable instruments. *Id.* at 706–07 (citing Act approved Jan. 25, 1840, 4th Cong., R.S., §§ 1–4, 1840 Republic of Texas Laws 144, 144–46, *reprinted in* 2 H.P.N., GAMMEL, LAWS OF TEXAS 318, 318–20 (1898) (formerly at TEX.REV.CIV. STAT. ANN. art. 568–71 (Vernon 1935))). Furthermore, Texas courts held that contract rights *not* covered by the statute could be assigned. *Citizens State Bank v. O'Leary*, 140 Tex. 345, 167 S.W.2d 719, 721 (Tex.1942). As the court stated in *O'Leary*:

> [E]verything which can be called a debt can be assigned, and the assignee may recover either in his own name or in that of his assignor. In other words, any chose in action may be assigned and suit brought thereon by the equitable holder.

*Id.; see also Hopkins v. Upshur*, 20 Tex. 89 (1857).

▮▮ Eventually, personal injury claims became assignable in Texas. *Gandy*, 925 S.W.2d at 707 (citing *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 22 (Tex.1987)). Thus, the general rule in Texas has been that causes of action are assignable absent a statutory bar. *Southland Corp. v. Kilgore &*

*Kilgore*, 19 F.3d 1084, 1089 (5th Cir.1994); *Charles v. Tamez*, 878 S.W.2d 201, 206 (Tex. App.—Corpus Christi 1994, writ denied); *American Indemnity Co. v. Baumgart*, 840 S.W.2d 634, 637–38 (Tex.App.—Corpus Christi 1992, no writ). *See* TEX. PROP.CODE ANN. § 12.014(a) (Vernon 1984). Texas courts, however, have found exceptions to this general rule. In certain instances, based upon public policy considerations, some causes of action are not subject to assignment.[3] *See, e.g., Gandy*, 925 S.W.2d at 712–13 (holding defendant's assignment of claims against his insurer to a plaintiff invalid under certain circumstances); *Elbaor v. Smith*, 845 S.W.2d 240, 250 (Tex.1992) (holding Mary Carter agreements[4] void); *International Protein's Corp. v. Ralston–Purina Co.*, 744 S.W.2d 932, 934 (Tex.1988) (holding tortfeasor cannot take assignment of a plaintiff's claim as part of settlement agreement with the plaintiff and prosecute that claim against a joint tortfeasor); *Trevino v. Turcotte*, 564 S.W.2d 682, 690 (Tex.1978) (holding assignment of interest in an estate invalid); *City of Garland v. Booth*, 895 S.W.2d 766, 771 (Tex. App.—Dallas 1995, writ denied) (holding client could not assign legal malpractice claim arising out of litigation); *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 318 (Tex.App.—San Antonio 1994, writ ref'd) (holding the same as *Booth* ).

Appellees' argument that section 12.014 of the Texas Property Code mandates that this court uphold the validity of the assignments is without merit. Section 12.014(a) states:

> A judgment or part of a judgment of a court of record or an interest in a cause of action on which suit has been filed may be sold, regardless of whether the judgment

---

**2.** For a discussion of the reasons behind this early rule *see State Farm Fire and Casualty Co. v. Gandy*, 925 S.W.2d 696 (Tex.1996), and the citations therein.

**3.** Courts also hold that certain causes of action are not subject to turnover under TEX. CIV. PRAC. & REM.CODE ANN. § 31.002 (Vernon 1986) because it would violate public policy. *Charles v. Tamez*, 878 S.W.2d 201, 205 (Tex.App.—Corpus Christi 1994, writ denied) (citing *Associated Ready Mix, Inc. v. Douglas*, 843 S.W.2d 758, 762 (Tex.App.—Waco 1992, orig. proceeding); *Criswell v. Ginsberg & Foreman*, 843 S.W.2d 304, 306–07 (Tex. App.—Dallas 1992, no writ); *Commerce Sav.*

*Ass'n v. Welch*, 783 S.W.2d 668, 669–71 (Tex. App.—San Antonio 1989, no writ)). Though assignment and turnover are different, the public policy concerns that would bar voluntary assignment also oppose forced transfer through turnover. *Charles*, 878 S.W.2d at 206.

**4.** A "Mary Carter" agreement is (1) an agreement settling a dispute between the plaintiff and one of two or more defendants, (2) retaining the settling defendants as a party in the trial, and (3) giving the settling defendant a financial interest in the plaintiffs recovery against the other defendant(s). *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 857–58 (Tex.1977).

or cause of action is assignable in law or equity, if the transfer is in writing.

TEX. PROP.CODE ANN. § 12.014(a) (Vernon 1984).

■ The Texas Supreme Court held other assignments invalid despite the language of section 12.014. *See Gandy,* 925 S.W.2d at 712–13; *Elbaor,* 845 S.W.2d at 250; *Ralston–Purina Co.,* 744 S.W.2d at 934; *Trevino,* 564 S.W.2d at 690. The court based holdings in these case on public policy considerations. The policy reasons behind the rejection of certain assignments persist despite the existence of section 12.014. That the supreme court did not specifically address section 12.014 in these cases is unpersuasive. We decline to accept that the supreme court was unaware of the provision, nor do we presume the court chose to ignore it.

Three Texas courts have recently confronted the issue of assignability of legal malpractice claims. *See Booth,* 895 S.W.2d at 771; *Zuniga,* 878 S.W.2d at 318; *Stonewall Surplus Lines Ins. Co. v. Drabek,* 835 S.W.2d 708, 711 (Tex.App.—Corpus Christi 1992, writ denied). The Texas Supreme Court has twice left the question open. *See Barcelo v. Elliott,* 923 S.W.2d 575, 579 n. 2 (Tex.1996); *American Centennial Ins. v. Canal Ins.,* 843 S.W.2d 480, 484 n. 6 (Tex.1992). The Corpus Christi Court of Appeals, apparently the first Texas court to confront the issue, held that a part or all of a legal malpractice claim may be assigned, just as any other negligence claim. *Drabek,* 835 S.W.2d at 711. In *Zuniga,* the San Antonio Court of Appeals, rejected the decision in *Drabek* and held that legal malpractice claims arising from litigation are not assignable. After the *Zuniga* decision, the Dallas Court of Appeals adopted *Zuniga* and its reasoning. *See Booth,* 895 S.W.2d at 769. V & E argues that *Zuniga,* a "writ refused" decision, compels this court to hold that all assignments of legal malpractice

claims are invalid. Appellees counter that V & E's interpretation of *Zuniga,* as banning all assignments of legal malpractice claims, is mistaken. Appellees contend *Zuniga* only disallows the assignment of a legal malpractice claim *arising from underlying litigation* by a judgment proof defendant to the non-client plaintiff, and that the facts of this case do not fit within the *Zuniga* fact pattern.

In the *Zuniga* case, Zuniga sued Bauer Manufacturing Company and other defendants for damages he sustained when he fell from a ladder manufactured by Bauer. *Zuniga,* 878 S.W.2d at 314. While the litigation was pending, Bauer's insurer became insolvent. *Id.* Fearing bankruptcy if Zuniga recovered a large judgment, Bauer allowed Zuniga to take a judgment against it for $25 million, and in settlement of the judgment, assigned its legal malpractice action against its attorney to Zuniga. *Id.* The contention was that in response to discovery requests, Bauer's attorney had negligently admitted partial liability to Zuniga. *Id.* While Zuniga did not covenant not to collect the judgment from Bauer, it allowed Bauer to transfer all of its assets to a new corporation, waived any right to the new corporation's assets, agreed that the transfer was not fraudulent, and released all claims against the individuals associated with Bauer. *Id.* Zuniga then sued Bauer's attorney for legal malpractice. *Id.*

The trial court dismissed Zuniga's suit against the attorney and Zuniga appealed. *Id.* On appeal, the San Antonio Court of Appeals affirmed the trial court's judgment, and the Texas Supreme Court ultimately refused writ of error.[5]

In its opinion, the San Antonio court first declined to adopt the broad statement in *Drabek* that all legal malpractice claims are assignable, just like any other negligence claim. *Id.* In criticizing *Drabek,* the court

5. The Texas Supreme Court's refusal of writ of error in *Zuniga* indicates its approval of the judgment and principles of law declared in the opinion. *See Hamilton v. Empire Gas & Fuel Co.,* 134 Tex. 377, 110 S.W.2d 561, 565–66 (1937); TEX.R.APP. P. 133(a). Since June 14, 1927, a decision by a court of appeals in which the supreme court refuses writ of error is as binding as a decision of the supreme court itself.

*Ohler v. Trinity Portland Cement Co.,* 181 S.W.2d 120, 123 (Tex.Civ.App.—Galveston 1944, no writ). In fact, in *Gandy,* the supreme court discusses *Zuniga* and specifically refers to it as if it were a supreme court opinion. *Gandy,* 925 S.W.2d at 707–708. Thus, in our discussion of *Zuniga,* we will follow the supreme court's lead and refer to the discussion and holding as that of the supreme court.

found four reasons to decline to accept its statement: (1) it is dictum; (2) it is unsupported by any reasoning or authority; (3) it is overbroad and incorrect as a matter of substantive law; and (4) the issue is still open and unsettled in Texas. *Id.*

The issue in *Drabek* was whether an excess carrier could sue the primary carrier's attorneys. *Id.* at 315. The *Drabek* court did not *hold* that a malpractice claim is generally assignable. *Id.* (emphasis in the original). The San Antonio court declined to accept dictum as binding authority, especially since it was unsupported by reasoning or authority. *Id.*

Furthermore, the court found the *Drabek* dictum to be demonstrably incorrect because it is not true that *any* negligence claim is assignable. *Id.* (emphasis in the original). For example, a joint tortfeasor may not purchase a cause of action from a plaintiff to whose injury the tortfeasor contributed. *Id.* (citing *Ralston–Purina*, 744 S.W.2d at 934). Finally, on the same day the supreme court denied writ in *Drabek,* in a footnote it expressly left open the question of whether a legal malpractice claim is assignable. *See American Centennial*, 843 S.W.2d at 484 n. 6. Thus, the San Antonio court declared it was addressing the issue of assignability as an open question. *Zuniga*, 878 S.W.2d at 315.

The San Antonio court ultimately held that the legal malpractice claim arising from the litigation could not be assigned to Zuniga. *Id.* at 318. The court found that the assignment was a "transparent device to replace a judgment-proof, uninsured defendant with a solvent defendant." *Id.* at 317. The court reasoned that while such an assignment would enable a defendant-client to extricate himself from liability and fund the original plaintiff's judgment, the costs exacted by such an assignment would be too high. *Id.* It would allow the plaintiff to drive a wedge between the defense attorney and his client by creating a conflict of interest. *Id.* It would also create a situation in which it would be too risky for an attorney to represent uninsured or underinsured defendants. *Id.* Finally, the malpractice case would cause a reversal of the position taken by each

set of attorney and clients, which would embarrass and demean the legal profession as a whole. *Id.*

Based on these costs, the court held that an assignment of a legal malpractice action arising from litigation is invalid. Appellees look to this holding and contend that it is limited to those instances in which a judgment-proof defendant assigns his legal malpractice claim to the plaintiff. Because their assignments did not arise in the *"Zuniga"* context, i.e., an assignment resulting from underlying litigation in which the defendant is judgment proof, appellees argue their assignments are not barred by *Zuniga*.

While the court did base its reasoning, in part, on those cases that discuss the consequences that could arise from an assignment motivated by a plaintiff's inability to collect from an insolvent, uninsured defendant, and the policy reasons for disallowing such assignments, the court's discussion of the issue was not limited to a review of those cases involving that situation. *See, e.g., Brocato v. Prairie State Farmers Ins. Ass'n,* 166 Ill. App.3d 986, 117 Ill.Dec. 849, 850–51, 520 N.E.2d 1200, 1201–02 (1988), *appeal denied by,* 121 Ill.2d 567, 122 Ill.Dec. 434, 526 N.E.2d 827 (1988) (malpractice plaintiff was original plaintiff who was unable to collect against original defendant); *Picadilly, Inc. v. Raikos,* 582 N.E.2d 338, 339–45 (Ind.1991) (same); *Thurston v. Continental Casualty Co.,* 567 A.2d 922, 923 (Me.1989) (same); *Collins v. Fitzwater,* 277 Or. 401, 560 P.2d 1074, 1078 (1977). The court also reviewed the case relied on most often by courts in other jurisdictions, even those with fact patterns similar to *Zuniga*. *See Goodley v. Wank & Wank, Inc.,* 62 Cal.App.3d 389, 133 Cal.Rptr. 83 (Cal.Ct.App.1976).

Like the *Zuniga* court and the other jurisdictions that have addressed this issue, we too find that public policy considerations should guide our analysis, rather than straining to fit the particular fact pattern into a category. *See, e.g., Can Do, Inc. v. Manier, Herod, Hollabaugh & Smith,* 922 S.W.2d 865, 868 (Tenn.1996). Assignments should be permitted or prohibited based on the likely effect on society, and in particular, on the legal system. Employing a public policy

analysis, the majority of courts in this country have concluded that legal malpractice claims are not assignable. *See Continental Casualty Co. v. Pullman, Comley, Bradley & Reeves,* 709 F.Supp. 44 (D.Conn.1989), *aff'd,* 929 F.2d 103 (2d Cir.1991); *Scarlett v. Barnes,* 121 B.R. 578 (W.D.Mo.1990); *Schroeder v. Hudgins,* 142 Ariz. 395, 399–400, 690 P.2d 114, 118–119 (Ct.App.1984); *Goodley v. Wank & Wank, Inc.,* 62 Cal. App.3d 389, 133 Cal.Rptr. 83, 86 (1976); *Roberts v. Holland & Hart,* 857 P.2d 492, 495 (Colo.Ct.App.1993); *Washington v. Fireman's Fund Ins. Co.,* 459 So.2d 1148, 1149 (Fla.Dist.Ct.App.1984); *Brocato v. Prairie State Farmers Ins. Ass'n,* 166 Ill.App.3d 986, 117 Ill.Dec. 849, 850–51, 520 N.E.2d 1200, 1201–02 (1988), *appeal denied by,* 121 Ill.2d 567, 122 Ill.Dec. 434, 526 N.E.2d 827 (1988); *Christison v. Jones,* 83 Ill.App.3d 334, 39 Ill.Dec. 560, 563–64, 405 N.E.2d 8, 11–12 (1980); *Picadilly, Inc. v. Raikos,* 582 N.E.2d 338, 345 (Ind.1991); *Bank IV Wichita, Nat'l Ass'n v. Arn, Mullins, Unruh, Kuhn & Wilson,* 250 Kan. 490, 827 P.2d 758, 765 (1992); *Coffey v. Jefferson County Bd. of Educ.,* 756 S.W.2d 155, 156–57 (Ky.Ct.App.1988); *Moorhouse v. Ambassador Ins. Co., Inc.,* 147 Mich.App. 412, 383 N.W.2d 219, 221 (1985); *Joos v. Drillock,* 127 Mich.App. 99, 338 N.W.2d 736, 737 (1983); *Wagener v. McDonald,* 509 N.W.2d 188, 193 (Minn.Ct.App. 1993); *Earth Science Labs., Inc. v. Adkins & Wondra, P.C.,* 246 Neb. 798, 523 N.W.2d 254, 257 (1994); *Chaffee v. Smith,* 98 Nev. 222, 645 P.2d 966 (1982); *Can Do, Inc.,* 922 S.W.2d at 868; *Booth,* 895 S.W.2d at 771; *Zuniga,* 878 S.W.2d at 318.[6]

*Goodley* was the first case to confront the issue of assignment of legal malpractice claims, and is the case cited, either with approval or disapproval, in almost every other opinion written on the issue. *Goodley* also contains the best articulation of some of the policy considerations underlying rejection of assignability of legal malpractice claims. In *Goodley,* an assignee, a stranger to the original litigation, bought a divorce litigant's claims against the attorney for allegedly negligent representation regarding the property division. 133 Cal.Rptr. 83. The California court summarized the arguments in support of its holding that legal malpractice cases should not be assignable:

> It is the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment. The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any proper connection with the assignor or his rights. The commercial aspect of assignability of choses in actions arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden not only on the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Id.* at 87.

The court's focus was on the unique quality of legal services, the personal nature of the

---

**6.** A few states allow legal malpractice claims to be assigned. *See Ikuno v. Yip,* 912 F.2d 306, 313–14 (9th Cir.1990) (interpreting Washington law); *Thurston v. Continental Casualty Co.,* 567 A.2d 922, 923 (Me.1989); *American Hemisphere Marine Agencies, Inc. v. Kreis,* 40 Misc.2d 1090, 244 N.Y.S.2d 602 (N.Y.Sup.Ct.1963); *Collins v. Fitzwater,* 277 Or. 401, 560 P.2d 1074, 1078 (1977), *overruled on other grounds in, Lancaster v. Royal Ins. Co. of Am.,* 302 Or. 62, 726 P.2d 371, 373–74 (1986); *Hedlund Mfg. Co., Inc. v. Weiser, Stapler & Spivak,* 517 Pa. 522, 539 A.2d 357, 359 (1988).

attorney-client relationship, and the confidentiality of that relationship. Because of the special nature of the relationship between attorney and client, the court found that allowing assignments of claims arising from that relationship could only endanger its sanctity.[7] *Id.* We agree.

The assignment of a legal malpractice claim is incompatible with the attorney's duty of loyalty. *Picadilly*, 582 N.E.2d at 342. His or her loyalty would obviously be weakened by the knowledge that a client can sell or give a malpractice claim to another.[8] *Id.* A legal system that chills the duty of loyalty disserves the client and the public. *See id.* Moreover, an attorney's duty of confidentiality is also threatened by the assignment of legal malpractice claims. *Picadilly*, 582 N.E.2d at 343. The attorney-client privilege has been recognized as "the oldest of the privileges for confidential communications known to the common law." *Ford Motor Co. v. Leggat*, 904 S.W.2d 643, 647 (Tex.1995) (quoting *United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 2625, 105 L.Ed.2d 469 (1989)).

When an attorney is sued by his own client, the attorney is permitted to reveal confidential information so far as necessary to defend himself. *West v. Solito*, 563 S.W.2d 240, 245 n. 3 (Tex.1978). *See also* TEX.R. CIV. EVID. 503(d)(3) (stating no privilege exists as to communication relevant to issue of breach of duty by lawyer to client or by client to lawyer); *Apex Mun. Fund v. N–Group Securities*, 841 F.Supp. 1423, 1430 (S.D.Tex.1993) (stating that attorney can waive attorney-client privilege when accused by client of wrongdoing). When the client files suit, he retains control and thus, the scope of any disclosure can be limited by the client's power to drop the suit. *Picadilly*, 582 N.E.2d at 343. If the client is able to assign the claim, however, his control is lost, but the attorney's right to defend him or herself by revealing confidential information survives. *Id.*

Clients who anticipate this possibility are no better off than those who are blind-sided by it. *Id.* The anticipating client would be encouraged to withhold information from their attorney to preserve their ability to assign a malpractice claim without fear of losing control over confidential information. *Id.* The purpose of the attorney-client privilege is to ensure the free flow of information between the attorney and client. *Leggat*, 904 S.W.2d at 647. This serves the broader societal interest of effective administration of justice. *Id.* This interest is not served unless a client is able to confide in his attorney, secure in the knowledge that his communications will not be disclosed. *Id.* Assignment of legal malpractice claims would unquestionably erode the principles fostered by the duty of confidentiality, and ultimately, the effective administration of justice. *See Huie v. DeShazo*, 922 S.W.2d 920, 924 (Tex.1996) (stating that trustee must be able to consult freely with attorney and without attorney-client privilege, trustee might forsake legal advice adversely affecting the trust).

These policy considerations compel this court to hold that all legal malpractice claims are not assignable. The court's analysis employed in *Zuniga* supports this holding. While the *Zuniga* court expressed policy concerns particular to the fact pattern presented in the case, it also analyzed the issue by using cases expressing policy concerns, like those stated above, which are universal to the assignability question. For example,

---

7. We find the issue of assignability of contracts analogous. In general, all contracts are assignable. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 596 (Tex.1992). Yet, a contract that relies on the personal trust, confidence, skill, character, or credit of the parties may not be assigned without the consent of the parties. *Id.* The special and personal nature of the attorney-client relationship is similar to contract relationships requiring special trust, confidence, skill, or character. Therefore, like such unassignable contract rights, claims against attorneys are not assignable.

8. Though this is true whenever an opportunity exists for a claim to be assigned, it is particularly true when an adversary is the potential assignee or purchaser of the claim. *See Picadilly*, 582 N.E.2d at 342. If the attorney is doing an excellent job in his representation of the client, an adversary will likely be motivated to strike back at the attorney in any permissible fashion. *Picadilly*, 582 N.E.2d at 342. If an adversary can purchase the client's malpractice action, attorneys may not act so zealously out of fear of an assignment and retaliation by the adversary. *Id.*

*Goodley,* which was quoted extensively by the *Zuniga* court, was not a *"Zuniga"* factual pattern, yet the San Antonio court still referred to it as the "fountainhead case on the subject" and found its reasoning persuasive.[9] *Id.* at 316. Clearly, the court recognized the personal and confidential nature of the attorney-client relationship was an important consideration and does not change with a new fact pattern. Thus, simply because the assignment arises from a factual pattern unlike that in *Zuniga* does not mean the assignment is permissible. While the actual stated holding contained in the last paragraph of the *Zuniga* opinion is limited to claims "arising from litigation," we find the court's actual holding, based on its analysis and review of authority, is much broader and bars the assignment of all legal malpractice claims. The reasoning in the case extends well beyond its facts. Thus, based on the policy considerations stated in *Goodley, Zuniga,* and the other cases discussed, we hold that the best rule is to bar all assignments of legal malpractice claims.

In our interpretation of *Zuniga* and *Booth,* we find the Fifth Circuit's recent decision in *Britton v. Seale,* 81 F.3d 602 (5th Cir.1996), persuasive and supportive of our own assessment. That lawsuit arose from a feud between Britton and her brothers over their respective inheritances. *Id.* at 603. Britton sued her brothers, trustees of three trusts set up by the parents for Britton's benefit, for an accounting. *Id.* Apparently, she believed her brothers had stolen money from her trusts. *Id.* While the suit was pending, the Brittons' mother was declared incompetent and made a ward of the court; their father had died earlier. *Id.*

Britton eventually settled the suit with her brothers, largely with the mother's money.

*Id.* The settlement provided that the mother's guardian would not investigate malfeasance by the children, attorneys, or other professionals who had represented the mother. *Id.* The probate court later transferred, by assignment, any claims the mother had against the professionals to the children. *Id.*

Britton filed suit against the attorneys who had handled estate work for the Brittons' parents. These attorneys represented the mother and her guardian during the original suit, and also defended Britton's brothers against the original suit and helped negotiate the eventual settlement. *Id.* Britton alleged the attorneys committed legal malpractice by violating their professional duties to her mother because of a conflict of interest in representing both the mother and her sons in the same suit. *Id.* The district court dismissed the claim finding that Britton's suit could not proceed because legal malpractice claims are not assignable.

The Fifth Circuit, when confronted by Britton's argument that *Zuniga* was limited to "claims arising from litigation," stated:

> While the court of appeals limited the express holding of *Zuniga* to claims arising from litigation, its reasoning extends well beyond the facts of that case. The court discussed the pros and cons of assignment and concluded generally that "the costs to the legal system of assignment outweigh its benefits."

*Id.* at 604 (quoting *Zuniga,* 878 S.W.2d at 318). The court rejected the appellant's argument that Texas courts are concerned only with specific abuses such as the sale of claims to strangers for profit and transfer by defendants in settlement of litigation, and not with assignments in general. *Id.* While the court noted that *Zuniga* and *Booth* discussed a variety of specific problems that would result

---

9. In addition to the "commercial-marketing" and the "insolvent defendant" cases, the court also noted that in at least one case the assignment of legal malpractice claims did not fall into either category. In *Hedlund Manufacturing Co. v. Weiser, Stapler & Spivak,* 517 Pa. 522, 539 A.2d 357, 358 (1988), an attorney mishandled a patent application, and when the client sold the patent rights, he also assigned the malpractice action to the buyer. *Id.* The Pennsylvania Supreme Court, with little discussion, held the assignment was valid. *Id.* One justice, joined by

the Chief Justice, dissented and wrote that the majority decision erodes the longstanding rule that personal actions are not subject to assignment. *Id.* (Flaherty, J., dissenting) (citing *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744 (1983)). Furthermore, the dissent, quoting the policy considerations given in *Goodley,* opined that such considerations weigh against permitting the transfer of legal malpractice claims. *Hedlund Manufacturing,* 539 A.2d at 359 (Flaherty, J., dissenting).

from permitting assignments, it found that the cases did not limit the ban on assignments to cases presenting those specific problems. *Id.* Instead, the Fifth Circuit interpreted *Zuniga* and *Booth* to prohibit assignments of legal malpractice claims altogether to prevent the problems discussed in those cases from occurring. *Id.*

We agree with the Fifth Circuit and hold that *Zuniga* prohibits all assignments of legal malpractice claims. We see the disadvantages of assignments outweighing any advantages. Contrary to the argument made by appellees, our holding does not shield attorneys from malpractice suits nor does it deprive clients of the right to assert claims against their attorneys, it simply prevents them from giving or selling that right to others.

■ Appellees argue that even if *Zuniga* does bar the assignment of legal malpractice claims, no Texas case has held that causes of action against attorneys for conspiracy, violations of the DTPA, or other intentional torts are not assignable. While we agree that *Zuniga* does not address the assignment of these other claims, we hold that the same public policy reasons for prohibiting the assignment of legal malpractice claims also bar the assignment of these other claims.[10]

### B. Estoppel and Waiver

■ Appellees next argue that V & E is judicially or equitably estopped to contend that the assignments in this case are invalid. The doctrine of judicial estoppel was first recognized in Texas in *Long v. Knox,* 155 Tex. 581, 291 S.W.2d 292 (1956). The doctrine bars a party, who has successfully maintained a position in a prior judicial proceeding, from later adopting an inconsistent position, unless he can show the prior statement was made inadvertently due to mistake, fraud, or duress. *Owen v. Knop,* 853 S.W.2d 638, 641 (Tex.App.—Corpus Christi 1993, writ denied). The court adopted the doctrine based upon the public policy of upholding the

sanctity of the oath, *Lesser v. Allums,* 918 S.W.2d 81, 85 (Tex.App.—Beaumont 1996, no writ), and to eliminate the prejudice that would result to the administration of justice if a litigant were allowed to swear one way one time and a different way another time. *See Miles v. Plumbing Servs. of Houston, Inc.,* 668 S.W.2d 509, 512 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). The doctrine of judicial estoppel applies if all of the following elements are present: (1) a sworn, prior inconsistent statement made in a judicial proceeding; (2) the party now sought to be estopped successfully maintained the prior position; (3) the prior inconsistent statement was not made inadvertently or because of mistake, fraud, or duress; and (4) the statement was deliberate, clear, and unequivocal. *Owen,* 853 S.W.2d at 641 (citing *Knox,* 291 S.W.2d at 295).

In this case, appellees argue V & E is judicially estopped to contest the validity of the assignments because of certain statements made by its counsel at the beginning of the trial. On the first day of the trial, Pat Moran asserted his right to participate in the trial. V & E objected to Pat's participation. The basis of the objection was that Pat was only a nominal party because he had assigned all of his interest to Ann Moran. Specifically, the attorney for V & E stated:

> I certainly believe, in view of the assignments, that there is no real interest that Mr. Moran has in this case—in the outcome of this case, in that sense. He has assigned everything. He is a party in name only.

It is this statement to which the appellees point to support their argument that V & E is estopped. Appellees' position is incorrect for at least three reasons. First, the attorney who made this statement was not under oath at the time it was made. *See Owen,* 853 S.W.2d at 641.

Second, this statement was not unequivocal, deliberate, or clear. *See id.* In response to V & E's objection, counsel for appellees

---

10. Moreover, the appellees' documents and arguments throughout this case state that this is a legal malpractice case. Each of the claims alleged by appellees assert that V & E acted improperly in the course of performing legal ser-

vices for the Estate. We find little reason to depart from the appellees' own characterization of their suit. Thus, the numerous allegations raised by appellees are really nothing more an assertion of legal malpractice.

immediately pointed out that V & E was arguing the assignments were invalid; the trial court acknowledged it was aware of V & E's position. Clearly, everyone in the courtroom was aware of V & E's position regarding assignment. Thus, the statement could not have been clear and unequivocal. We find the statement by V & E's counsel is not the type of statement meant to invoke the doctrine of judicial estoppel.

■ Finally, the attorney's statement was simply an alternative argument in response to the possibility that the assignments were valid. If the trial court determined the assignments were valid, as it so clearly did, then Pat Moran should not have participated in the trial. V & E was simply asserting an alternative position in the same proceeding. Moreover, judicial estoppel does not apply to a contradictory position taken in the same proceeding; it is called into play only in a subsequent action. *Wells v. Kansas University Endowment Ass'n*, 825 S.W.2d 483, 488 (Tex.App.—Houston [1st Dist.] 1992, writ denied). We are convinced that an appeal from the "prior" or "former" proceeding is not a "subsequent action" to which judicial estoppel is applicable.[11]

■ Appellees' contention that V & E is equitably estopped fares no better. Equitable estoppel is distinguished from judicial estoppel in that the former requires reliance and injury while the latter does not. *Knox,* 291 S.W.2d at 295. Nothing demonstrates that either Ann Moran or Jim Poinsett relied on the statement by V & E's attorney. In fact, their attorney quickly responded to the statement by reminding the trial court that V & E's position was the assignments were invalid. Appellees can scarcely maintain

they relied on the statement and their reliance caused them injury.

■ Besides, neither judicial nor equitable estoppel is pertinent to the issue of assignability; these concepts of estoppel involve admissions that dispense with the production of evidence and take an issue out of the domain of proof. *See Webster v. Lipsey,* 787 S.W.2d 631, 636 (Tex.App.—Houston [14th Dist.] 1990, writ denied). The question of the assignability of legal malpractice claims requires no evidentiary proof, i.e., it is a purely legal issue. Thus, estoppel is not relevant.

■ Appellees also contend that V & E waived any argument regarding the validity of the assignments because V & E allowed appellees to introduce the executed assignment documents into evidence without objection, and used the documents during cross-examination for impeachment purposes. But, V & E's contention is based on a legal theory; its complaint is not evidentiary. The introduction of the assignment documents was to show the assignments were in fact made. The documents could not be introduced to prove the validity of the assignments because validity is a question of law for the court, not an evidentiary issue for the jury. Therefore, while V & E's failure to object to their introduction into evidence would waive any *evidentiary* complaint regarding the documents, it does not waive the *legal* contention as to the validity of the assignments. *Cf. Harkins v. Crews,* 907 S.W.2d 51, 54 (Tex.App.—San Antonio 1995, writ denied) (party contested validity of will based on undue influence and will was admitted into evidence); *Holcomb v. Holcomb,* 803 S.W.2d 411, 413–14 (Tex.App.—Dallas 1991, writ denied) (same).

---

11. Furthermore, the doctrine of judicial estoppel requires success in the first proceeding by the party sought to be estopped, and then an inconsistent position in a subsequent proceeding. *Lesser v. Allums,* 918 S.W.2d 81, 85 (Tex.App.—Beaumont 1996, no writ). The success in this case would have been the trial court's refusal to allow Pat Moran to participate in the trial. After a careful review of this portion of the record, we find the trial court made no such final determination. The trial court's statements with regard to Pat Moran's participation are preliminary in nature. For example, the trial court told Pat that

he could be in the courtroom, "but you can't say anything until we figure out where you are." Additionally, the trial court noted on the record that no one had asked for a final determination as to Pat Moran's participation and that if he desired he could have appellees' attorney approach the bench and the court would hear the issue as an outside matter. Pat Moran never reurged the issue during trial. Thus, it was not so much a "success" by V & E as Pat Moran's failure to assert his position and get a final, clear ruling.

In support of their argument, appellees cite *Barras v. Monsanto Co.*, 831 S.W.2d 859 (Tex.App.—Houston [14th Dist.] 1992, writ denied). In that case, this court held the appellant waived any complaint about the admission of the Mary Carter agreements into evidence because he did not object to an instruction given by the trial court before voir dire. *Id.* at 863–64. We find this case distinguishable because the issue in *Barras* was not the *validity* of the "Mary Carter" agreements, but rather whether the agreements were admissible into evidence before the jury. *See id.* We hold that V & E did not waive its argument regarding the legal validity of the assignments.

### C. Assignments by River Oaks and Pat Moran

■ Appellees next argue that the assignments by River Oaks, the successor administrator, were valid and provide a legal basis for recovery because of section 224 of the Texas Probate Code and because the probate court approved the transfer.[12] That River Oaks was "clothed with all rights, powers, and duties" of its predecessor administrators does not validate the assignments. We have held that legal malpractice claims are not assignable. The claims in this case should have been brought directly by those in privity with V & E. This would, of course, include the executors as representatives of the Estate; however, the executors could not assign their malpractice claims to a third party. Thus, the fact that River Oaks stepped into the shoes of Pat Moran and the other executors simply means that it could assert a claim against V & E on behalf of the Estate. It does not somehow validate an assignment. Furthermore, the mere fact that the probate court has general statutory authority to order the transfer of property does not permit it to order the transfer of a legal malpractice claim. *Britton*, 81 F.3d at 604. *See also Charles*, 878 S.W.2d at 205 (holding that under some circumstances, judgment creditor is not entitled to transfer

of legal malpractice claim under turnover statute). A probate court's transfer cannot effect an assignment in derogation of the law. *See Britton*, 81 F.3d at 605.

■ Additionally, the assignment by Pat Moran as executor does not provide a legal basis for recovery because we have held legal malpractice claims are not assignable. As an executor, Pat Moran could bring a claim directly against V & E; however, his status as executor does not confer the right to assign that claim to another. When an assignment is invalid as a matter of law, the status of the assignor is irrelevant.

### D. Constitutional Complaints

■ Finally, appellees and Pat Moran, as appellee, argue that prohibiting assignments of legal malpractice claims would violate numerous provisions of the Texas and United States Constitutions. We note that the briefing on these issues is paltry at best, and thus, we will respond to the arguments generally. First, no unlawful taking or deprivation of property occurs when an assignment of a certain type of claim is prohibited. *See generally* U.S. CONST. amends. V & XIV; TEX. CONST. art. I, § 19. A client who is prohibited from giving or selling his legal malpractice claim has not lost any property or any rights. He is still entitled to sue his attorney; no property or right has been lost.

■ Second, while prohibiting the assignment of legal malpractice claims does limit the ability of a person to contract, we do not find the limitation to violate either constitution. *See generally* U.S. CONST. art. 1, § 10; TEX. CONST. art. I, § 16. The prohibition against the impairment of the obligation of contracts is directed against the impairment of the obligation rather than the contract. TEX. CONST. art. I, § 16, interp. commentary (Vernon 1984). The constitutional prohibition on the impairment of contract rights is not absolute and must yield to a valid exercise of the state's police power.

---

12. Section 224 states, in pertinent part:
When a representative of the estate not administered succeeds another, he shall be clothed with all rights, powers, and duties of his predecessor, except such rights and powers conferred on the predecessor by will which are different from those conferred by this Code generally.
TEX. PROB.CODE ANN. § 224 (Vernon 1980).

*Texas State Teachers Ass'n v. State,* 711 S.W.2d 421, 424 (Tex.App.—Austin 1986, writ ref'd n.r.e.). The Texas Supreme Court has disallowed the assignment of certain claims in other instances with no mention of violations of the constitutional rights regarding the right to contract. *See, e.g., Gandy,* 925 S.W.2d at 712–13 (holding defendant's assignment of claims against his insurer to a plaintiff invalid under certain circumstances); *Elbaor,* 845 S.W.2d at 250 (holding Mary Carter agreements void); *Ralston–Purina Co.,* 744 S.W.2d at 934 (holding tortfeasor cannot take assignment of a plaintiff's claim as part of settlement agreement with the plaintiff and prosecute that claim against a joint tortfeasor); *Trevino,* 564 S.W.2d at 690 (holding assignment of interest in an estate invalid). In this instance, the prohibition is necessary for the orderly administration of our judicial system.

Nor does a prohibition against assignments violate the equal protection provisions in the state and federal constitutions. *See generally* U.S. CONST. amend. XIV; TEX. CONST. art. 1, § 3. Neither appellees nor Pat Moran has cited any authority to suggest that a prohibition of an assignment violates equal protection. When a classification does not infringe upon fundamental rights or does not burden an inherently suspect class, equal protection requires only that the rule or statute in question be rationally related to a legitimate state interest. *Hogan v. Hallman,* 889 S.W.2d 332, 338 (Tex.App.—Houston [14th Dist.] 1994, writ denied). We find no such rights or classes in this case, and find that the state interest in the fair administration of justice through the protection of the attorney-client relationship is a legitimate state interest. Moreover, the equal protection clause only requires that those who are similarly situated be treated equally. *Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985). In this case, similarly situated individuals, those who wish to assign legal malpractice claims, are being treated equally; *no one* who has a legal malpractice claim against an attorney may assign it.

Appellees and Pat Moran also assert that if we prohibit the assignment of legal malpractice claims, it will violate the constitutional prohibition against *ex post facto laws. See generally* U.S. CONST. art. I, § 10; TEX. CONST. art. I, § 16. Once more, however, appellees have not cited any authority supporting their position. Unless vested rights are destroyed or impaired, a law is not invalid even though retroactive in operation. *Corpus Christi People's Baptist Church, Inc. v. Nueces County Appraisal Dist.,* 904 S.W.2d 621, 626 (Tex.1995). Our decision does not destroy or impair a client's right to redress; it simply prescribes the method by which this may be accomplished. Again, the supreme court has held in numerous cases that assignments, though already made, were invalid. *See Gandy,* 925 S.W.2d at 712–13; *Elbaor,* 845 S.W.2d at 250; *Ralston–Purina Co.,* 744 S.W.2d at 934; *Trevino,* 564 S.W.2d at 690. None of these cases mention the possibility that the holding was violative of the *ex post facto* provisions of the state and federal constitutions.

In the last constitutional argument, Pat contends that prohibiting the assignment of legal malpractice claims violates the separation of powers doctrine. He argues that the Texas Legislature has already determined that these assignments are valid through the enactment of section 12.014 of the Texas Property Code. As we have already stated, the Texas Supreme Court has held other assignments invalid despite the language of section 12.014. *See Gandy,* 925 S.W.2d at 712–13; *Elbaor,* 845 S.W.2d at 250; *Ralston–Purina Co.,* 744 S.W.2d at 934; *Trevino,* 564 S.W.2d at 690. The holdings in these cases were based on public policy considerations. The policy reasons behind the rejection of certain assignments exist despite the existence of section 12.014. The courts of this state often determine the extent and applicability of statutes. This is one of the important functions of the court and does not violate the separation of powers doctrine.

### E. Appellate Status of the Assignors

The judgment in this case was in favor of "Ann Moran and Jim Poinsett, Individually and as Assignees of the claims of any other beneficiaries, trustees, executor, or administrator of the Moran Estate." The beneficiaries who assigned any claims they

might have had to Ann Moran or Jim Poinsett, were joined in the suit as involuntary plaintiffs. The only assignor or "involuntary plaintiff" to participate in this appeal is Pat Moran. Pat filed a cost bond and by cross-point asks this court to afford him an opportunity to prosecute his claims directly in the event we determine his assignment to Ann Moran was invalid. *See* Tex.R.App. P. 40(a)(1) (stating that appeal is perfected when bond, cash deposit, or affidavit in lieu thereof is filed). V & E argues that Pat is not entitled to a remand for a new trial because he did not file a motion for new trial. We disagree with this argument.

 The identity of the parties to an appeal is determined by reference to the cost bond. *Lone Star Ford, Inc. v. McCormick*, 838 S.W.2d 734, 742 (Tex.App.—Houston [1st Dist.] 1992, writ denied). A person or entity whose interest is adjudicated in a judgment is properly an appellee with respect to that judgment if named in a proper cost bond or proper substitute timely filed with the trial court clerk. *Id.* (citing Tex.R.App. P. 46(a)). An appellee may use cross-points in his brief if they affect the interest of the appellant or bear upon matters presented in the appeal. *McCormick*, 838 S.W.2d at 742. Here, Pat's interest in this case was adjudicated in the judgment by implication. Because the trial court entered judgment in favor of Ann Moran and Jim Poinsett, individually *and as assignees*, Pat's interest as an assignor was adjudicated by the trial court's granting recovery to Ann Moran and Jim Poinsett as assignees. The trial court clearly found the assignments to be valid.

Because Pat filed a cost bond, he is a proper appellee, and it is appropriate for him to use a cross-point to request relief in the event the trial court's decision on the assignment issue is overturned by this court. His cross-point affects the interests of V & E and bears directly upon matters presented in the appeal. *See id.* There was no need for Pat to file a motion for new trial because he had nothing about which to complain; the trial court had accepted his position and determined the assignments were valid. *See* Tex.R. Civ. P. 324(a) & (b) (stating that motion for new trial is not prerequisite to

complaint on appeal except in certain instances). Because we have determined the assignments were invalid, we hold Pat is entitled to a remand for an opportunity to prosecute any claims he might have against V & E. The other assignors are not entitled to a remand for a new trial. These assignors have not filed briefs in this court requesting a remand in the event we determine the assignments are invalid. Thus, they are not entitled to a remand for a new trial.

### F. Conclusion

In conclusion, we hold that the assignments in this case were invalid because legal malpractice claims or other claims against attorneys for misconduct in the representation of a client are not assignable. We sustain V & E's first point of error. Because we have sustained this point, we find it necessary to sustain Pat Moran's first and only cross-point. Thus, as to Pat, we reverse and remand to accord him the opportunity to pursue his claims, if any, against V & E. Since we have determined the assignments were invalid, we need only consider whether Ann Moran and Jim Poinsett can recover on their direct claims.

### III. PRIVITY OF CONTRACT AND CONSUMER STATUS UNDER THE DTPA

In this part of the appeal, V & E contends Ann Moran and Jim Poinsett cannot recover on their direct claims. V & E raises complaints concerning privity and consumer status under the DTPA.

### A. Privity of Contract

In points of error two and three, V & E raises complaints concerning the jury question and answer relating to the alleged attorney-client relationship between the Moran beneficiaries and V & E. In jury question one, the jury was asked whether an attorney-client relationship was established between V & E and the Moran beneficiaries. The jury was instructed that the term "attorney-client relationship" means a relationship that exists if an attorney or law firm has *agreed*, expressly or impliedly, to render legal services to the person claiming such a relationship

exists. In its second point of error, V & E argues that the evidence is legally and factually insufficient to support the jury's affirmative response to question one. In point of error three, V & E claims the trial court erred in refusing its requested instruction defining the term "agreed."

At common law, an attorney owes a duty of care only to his or her client, not to third parties who may have been damaged by the attorney's negligent misrepresentation of the client. *Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex.1996). It has long been settled in Texas that persons outside the attorney-client relationship do not have a cause of action for injuries they might sustain from the attorney's failure to perform or his or her negligent performance of a duty owed to the client.[13] *Drabek*, 835 S.W.2d at 710; *Parker*, 772 S.W.2d at 156. In other words, Texas law does not recognize a cause of action for negligence against an attorney asserted by one not in privity with that attorney. *Thompson v. Vinson & Elkins*, 859 S.W.2d 617, 621 (Tex.App.—Houston [1st Dist.] 1993, writ denied) (quoting *Dickey v. Jansen*, 731 S.W.2d 581, 582 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.)). The majority of jurisdictions follow this rule. *See* Jack W. Shaw, Jr., Annotation, *Attorney's Liability, To One Other Than His Immediate Client, For Consequences of Negligence in Carrying Out Legal Duties*, 45 A.L.R.3d 1181, 1181–85 (1972).

Without this "privity barrier," clients would lose control over the attorney-client relationship, and attorneys would be subject to almost unlimited liability. *Barcelo*, 923 S.W.2d at 577. *See also* Helen Jenkins,

*Privity—A Texas Size Barrier to Third Parties for Negligent Will Drafting—An Assessment and Proposal*, 42 Baylor L. Rev. 687, 689–90 (1990). The courts of this state have uniformly applied the privity barrier in the estate planning context. *Barcelo*, 923 S.W.2d at 577; *see Thompson*, 859 S.W.2d at 622; *Dickey*, 731 S.W.2d at 583; *Berry v. Dodson, Nunley & Taylor*, 717 S.W.2d 716, 718–19 (Tex.App.—San Antonio 1986), *judgment vacated by agr.*, 729 S.W.2d 690 (Tex.1987). In *Barcelo*, the Texas Supreme Court specifically refused to recognize an exception to the privity barrier in cases involving estate and trust planning. 923 S.W.2d at 577. The court held that an attorney who negligently drafts a will or trust agreement owes no duty of care to those intended to benefit under the will or trust, and therefore, the intended beneficiaries cannot sue the attorney. *Id.* at 578. Though the court recognized that the majority of other states addressing the issue have relaxed the privity barrier in the estate planning context, the court found that the greater good would be served by preserving a bright-line privity rule that denies a cause of action to all beneficiaries whom the attorney did not represent.[14] *Id.* at 577–78.

Public policy concerns support a bright-line rule. Without the privity barrier, fear of liability would inject undesirable self-protective reservations into the attorney's counseling role. The preoccupation with the possibility of claims by any one with whom the client might deal would prevent the attorney from devoting his entire energies to the client's interest. The result would be an unreasonable burden on the profession and a decline in the quality of legal services. Furthermore, opening the attorney-client rela-

---

13. The only exception to this rule occurs in those rare instances involving fraud or a dangerous condition constituting a breach of duty owed to the general public. *Parker v. Carnahan*, 772 S.W.2d 151, 156 (Tex.App.—Texarkana 1989, writ denied).

14. The states that have relaxed the privity barrier in the estate context have taken different approaches. Some states have allowed a broad cause of action by those claiming to be intended beneficiaries; other states have limited the class of plaintiffs to beneficiaries specifically identified in the will or trust. *Compare Stowe v. Smith*, 184 Conn. 194, 441 A.2d 81, 83 (1981) (allowing those claiming to be intended beneficiaries to sue

attorney for malpractice) *with Schreiner v. Scoville*, 410 N.W.2d 679, 682 (Iowa 1987) (allowing only those beneficiaries specifically identified in the will or trust to sue attorney for malpractice). The Texas Supreme Court rejected each approach because: (1) the broad approach would lead to disappointed heirs attempting to prove the attorney failed to implement the deceased testator's intentions; and (2) the limited approach undermines the rationales supporting the privity rule because with a defective will there are concomitant questions as to the true intentions of the testator. *Barcelo v. Elliott*, 923 S.W.2d at 576, 577 (Tex.1996).

tionship to third parties, such as will or trust beneficiaries, would jeopardize the integrity of the testator's or trustor's confidential communications to the attorney.

■ Generally, an attorney hired by the executors or trustees to advise them in administering the estate or the trust represents the executors or trustees and not the beneficiaries. *See Huie,* 922 S.W.2d at 925 (citing *Thompson,* 859 S.W.2d at 621–23). It is conceivable, however, that the attorney for an executor or trustee could undertake to perform legal services as attorney for one or more beneficiaries. *Goldberg v. Frye,* 217 Cal.App.3d 1258, 266 Cal.Rptr. 483, 488 (1990). *See also Yaklin v. Glusing, Sharpe & Krueger,* 875 S.W.2d 380, 384 (Tex.App.—Corpus Christi 1994, no writ) (stating that existence of attorney-client relationship between bank and attorney did not necessarily negate the possibility of attorney's representing another in transaction with the bank). If an attorney-client relationship was created, whether expressly or impliedly, then a duty would be created directly in favor of the beneficiary, and the beneficiary would have recourse against the attorney for damages resulting from negligent representation. *Id.* The specific question in point of error two is whether the evidence supports the jury's finding that an attorney-client relationship existed in this case.

V & E argues, based on the supreme court's holding in *Huie v. DeShazo,* that it is entitled to rendition because the attorney for the executor is not the attorney for the beneficiaries. While *Huie* does hold that only a trustee, not the trust beneficiary, is the client of the trustee's attorney, the issue in the case was whether the beneficiary could discover communications between the trustee and the attorney. *Id.* There was no allegation, much less a jury finding, that an attorney-client relationship had been created based on the conduct and statements of the attorney. Thus, *Huie* is clearly distinguishable from the case before us.

In *Huie,* the court held that a trustee who retains an attorney to advise him or her in administering the trust is the real client. Thus, V & E also argues it could not have represented both the executors and the es-

tate because to do so would have imposed coextensive and conflicting duties on the firm. *See Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 279 (Tex.1995) (holding that insurance company is not required to perform duties for third-party claimants that are "coextensive and conflicting" with duty owed to insured). The holding in *Huie,* however, does not mean that an attorney could never conduct himself or herself in such a way as to *create* an attorney-client relationship with a beneficiary. That V & E was the attorney for the executors, and perhaps, *should not have* represented the beneficiaries because of potential conflicts, does not establish *per se* that it *did not* represent the beneficiaries. Just because an act is prohibited or involves a potential violation of the disciplinary rules does not mean that it cannot or did not occur. If that were true, then no attorney would ever be guilty of violations of the disciplinary rules; he could simply argue that he could not be guilty because the rules prohibited the action in question. Thus, V & E's argument is without merit.

We must now review the evidence to determine whether it is sufficient to support the jury's finding that an attorney-client relationship existed between V & E and the beneficiaries. The standard of review for sufficiency challenges is well-established. When reviewing legal and factual sufficiency challenges, an appellate court must first address the legal sufficiency challenge to determine if there is any evidence of probative value to support the jury's finding. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981). In our review of a legal sufficiency or "no evidence" claim, we must consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988). The finding must be upheld if there is more than a scintilla of evidence to support it. *Stedman v. Georgetown Sav. & Loan Ass'n,* 595 S.W.2d 486, 488 (Tex.1979). If, however, the evidence is so weak as to create no more than a mere surmise or suspicion of the existence of the finding, the evidence is no more than a scin-

tilla and is no evidence. *Kindred v. Con/ Chem.*, 650 S.W.2d 61, 63 (Tex.1983).

If there is some evidence to support the verdict, we must then review the factual sufficiency claim by weighing and considering the evidence both in support of, and contrary to, the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *International Piping Sys. Ltd. v. M.M. White & Assoc.*, 831 S.W.2d 444, 447 (Tex.App.—Houston [14th Dist.] 1992, writ denied). The finding must be upheld unless it is so against or contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain*, 709 S.W.2d at 176. The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Herbert v. Herbert*, 754 S.W.2d 141, 142 (Tex.1988). We may not substitute our judgment for that of the trier of fact simply because we may disagree with its conclusions. *Id.*

Jim Poinsett testified he attended beneficiary meetings where V & E gave advice to the beneficiaries. Specifically, at the first beneficiary meeting he attended, V & E gave the beneficiaries advice regarding taxes and tax consequences. At these meetings, V & E also discussed the alleged "liquidity crisis" facing the Estate and advised that the Estate's real estate assets should be held and other assets sold first. Poinsett named Schwartzel, Cuclis, and Wood as the V & E attorneys who were present at most of the beneficiary meetings. Poinsett stated that he never hired an attorney and considered V & E the legal representative for his interests and those of all the beneficiaries. He testified no one at V & E ever told him the firm did not represent him or his interests.

Ann Moran testified that V & E took the position early in the administration of the Estate that it represented the "Moran interests." She said V & E attorneys stated they represented "the Moran family, the Moran Estate, the Moran Estate family, [and] Moran Estate interests." Ann Moran testified no one could ever think that V & E did not represent the beneficiaries. She said she was a Moran, and Jim Poinsett is a Moran, and all those included by W.T. Moran in the will are part of the Moran family. Thus, she

opined there could not be any issue whether V & E represented the interests of the beneficiaries. Ann Moran specifically stated that V & E attorneys Wood, Cuclis, and Schwartzel passed themselves off as representing the family. She testified she was never told the firm did not represent her or the other beneficiaries. Ann also testified V & E said they represented the Moran family, and that included "this whole extensive group of people and our businesses."

She also stated that beneficiaries received mailings directly from V & E and had contact with them at the formal beneficiaries' meetings. In response to a question about specific instances of legal advice and representation by V & E to her and the other beneficiaries, Ann testified that at the beneficiary meetings V & E specifically discussed: (1) the cash short-fall; (2) the need to sell cash-producing assets; (3) the need to hold on to the real estate; and (4) the tax deferral issue. She said the discussions were between V & E attorneys and beneficiaries that attended the meetings. At the formal beneficiary meetings, numerous V & E lawyers attended and presented information and opinion. The attorneys discussed Estate issues with the beneficiaries before, during, and after the meetings.

She testified that interaction and verbal communication between the beneficiaries and V & E persisted throughout the administration of the Estate and continued beyond the time Pat Moran filed the executors' suit. Ann said that even after the executors' suit was filed, she and other members of the family group, who were trying to hold on to one of the Moran companies, had continued dealings with V & E, verbal and written.

As to her personal contacts with V & E, she stated she had "quite a number of contacts with the attorneys" at the few beneficiary meetings she attended, and she received direct mailings from Cuclis and Schwartzel. She was told that if she had any questions, she should call them, and she did. She stated she also had contact with Cuclis by phone. At one point, Ann sent Cuclis a letter, which began "Dear Jay," referencing an earlier phone call where she had expressed some concern about signing a docu-

ment. The tone of the letter indicates that she was still concerned and felt warranted in expressing her apprehension to Cuclis directly.

Ann testified that Schwartzel sent her documents that were to be signed and notarized and then returned to V & E. At one point, Ann had a question about expected distributions, for tax planning purposes, and she had to talk to V & E, specifically Schwartzel, to find out what he expected the distributions would be. She stated she depended on Schwartzel any time a tax problem arose. She found out that other beneficiaries were getting the same kind of statements and information from Schwartzel. She also learned that she was, in effect, paying V & E's legal fees. She realized the firm's fees were paid out of the expected distributions from the Estate based on the pro rata share each beneficiary was expected to receive.[15]

Pat Moran, like Ann, testified that V & E "represented the whole Estate and the people in it." He further stated that the firm represented the "Moran interests," which would include the Frankes, the Poinsetts, himself, and Ann. He said V & E represented everyone, beneficiaries and executors, but in different capacities.

Ann Moran and Jim Poinsett also called an expert witness to testify as to whether an attorney-client relationship existed between V & E and the beneficiaries. Steve Peterson, former general counsel for the State Bar of Texas, testified the beneficiaries could reasonably conclude that V & E represented their interests.[16] Appellees' probate expert, Walker Arenson, testified there was substantial evidence that V & E was representing the interests of the beneficiaries as well as the co-executors. Even V & E's expert admitted that an attorney-client relationship can be established with beneficiaries by the parties' conduct and course of dealing.

In response to this evidence, V & E produced evidence to show the beneficiaries, particularly Ann Moran and Jim Poinsett, were not clients. On cross-examination, Poinsett admitted that he never "personally hired" V & E, that the executors hired the firm. He admitted he did not know the details of the arrangement between the executors and V & E or the scope of the representation. He testified he never heard anyone from V & E tell any beneficiary that V & E represented the beneficiaries, and in fact, V & E often told him to consult his own attorney. He acknowledged he was unaware of any specific legal advice given by V & E in his presence to him or anyone else. He said he could not recall whether V & E gave any legal advice at any beneficiaries' meeting he attended.

V & E points to Ann's testimony in which she admitted she hired her own attorneys. Thus, V & E claims that it could not have represented Ann. Ann clarified her testimony and stated her personal lawyers represented her where her interest might diverge from the interests of the beneficiaries as a whole. V & E argues that, as a matter of law, one beneficiary's interest diverges from the interests of the beneficiaries as a whole, and thus, Ann was admitting that V & E never represented her. We disagree with V & E's interpretation of her testimony, and find the jury could have determined there were instances in which the interests of the beneficiaries were unified. We cannot say as a matter of law that V & E never represented Ann individually. Furthermore, that a client hires more than one attorney

---

15. We note that the existence of an attorney-client relationship does not depend upon the payment of a fee, but may exist as a result of rendering services gratuitously. *Perez v. Kirk & Carrigan*, 822 S.W.2d 261, 265 (Tex.App.—Corpus Christi 1991, writ denied) (citing *E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 388 (S.D.Tex. 1969); *Kotzur v. Kelly*, 791 S.W.2d 254, 257 (Tex.App.—Corpus Christi 1990, no writ); *Prigmore v. Hardware Mut. Ins. Co. of Minn.*, 225 S.W.2d 897, 899 (Tex.Civ.App.—Amarillo 1949, no writ)). Nevertheless, the fact that the beneficiaries, albeit indirectly, paid V & E's fees is evidence upon which the jury could rely in determining whether an attorney-client relationship existed between V & E and the beneficiaries.

16. As general counsel for the State Bar, Peterson had responsibility for the entire disciplinary process involving lawyers in the State of Texas. His duties included: (1) acquisition and filing of complaints; (2) review of complaints; (3) grievance committee investigation into complaints; and (4) trials and appeals involving professional responsibility and ethical problems.

does not mean, in and of itself, she only has an attorney-client relationship with only one of the attorneys. For example, on the cover of its brief, V & E lists no less than three separate firms as "ATTORNEYS FOR APPELLANT VINSON & ELKINS."

Ann admitted she never personally hired V & E, but she disagreed with V & E's claim that her personal attorneys, Crowell and Horrigan, represented her with respect to any aspect of the Estate that involved her. She refused to agree with V & E's attorney that V & E appeared at the formal beneficiaries' meetings at the request of the executors. While she stated that her personal attorneys may have been present at some of the meetings, she said she did not believe they attended all of them. Contrary to V & E's argument, Ann did not say that her attorneys represented her interests at those meetings. She testified that it depended on what the meeting was about.

Ann admitted that V & E sent mail directly to her at the request of her "other" attorneys, and the record shows "nearly" all communications were between attorneys for the beneficiaries and V & E. Not all of the communications, however, were handled this way. For example, Poinsett did not have a personal attorney, and thus, any communications from V & E went directly to him.

While this is not an exhaustive rendition of all of the evidence presented on this issue, we find the evidence legally and factually sufficient to support the jury's finding that an attorney-client relationship existed between V & E and the beneficiaries.[17] V & E's second point of error is overruled.

■ In its third point of error, V & E claims the trial court erred in refusing to instruct the jury on the definition of "agreed." The attorney-client relationship is a contractual relationship in which an attorney "agrees" to render professional services for a client. *Yaklin,* 875 S.W.2d at 383; *see Parker v. Carnahan,* 772 S.W.2d 151, 156 (Tex.App.—Texarkana 1989, writ denied). To establish the relationship, the parties must explicitly or by their conduct manifest

an intention to create it. *Terrell v. State,* 891 S.W.2d 307, 313 (Tex.App.—El Paso 1994, pet. ref'd) (citing *Parker,* 772 S.W.2d at 156). In other words, an attorney-client relationship may be established either expressly or impliedly from the conduct of the parties. *Terrell,* 891 S.W.2d at 313; *Yaklin,* 875 S.W.2d at 383; *Kotzur v. Kelly,* 791 S.W.2d 254, 257 (Tex.App.—Corpus Christi 1990, no writ); *Parker,* 772 S.W.2d at 156. To determine if there was an agreement or meeting of the minds one must use objective standards of what the parties said and did and not look to their subjective states of mind. *Terrell,* 891 S.W.2d at 313 (citing *Argonaut Ins. Co. v. Allstate Ins. Co.,* 869 S.W.2d 537, 540 (Tex.App.—Corpus Christi 1993, writ denied); *Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 717 (Tex.App.—Houston [1st Dist.] 1988, writ denied)); *American Nat'l Ins. Co. v. Paul,* 927 S.W.2d 239, 244 (Tex. App.—Austin 1996, writ requested October 7, 1996).

■ The instruction requested by V & E stated that "agreed" meant a meeting of the minds which must be determined from the "objective manifestations made by one party to another and not by the subjective intent of any one party not manifested to the other." V & E relies upon *Terrell* in arguing the trial court erred in refusing its instruction. When the trial court refuses to submit a requested instruction or definition, the issue is whether the request was reasonably necessary to enable the jury to render a proper verdict. TEX.R. CIV. P. 277. If, as here, the refusal is based on a determination that the request is unnecessary, the abuse of discretion standard is applied.

■ We hold the trial court's refusal to submit V & E's requested instruction was an abuse of discretion. There are countless contract cases holding that the determination of the existence of a contract must be based on objective actions and/or statements, and not on the subjective state of mind of the parties. *See, e.g., Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding Co., Inc.,* 480 S.W.2d 607, 609–10 (Tex.1972);

---

17. When affirming a factual sufficiency point, an appellate court is not required to detail all of the evidence. *Ellis County State Bank v. Keever,* 888 S.W.2d 790, 794 (Tex.1994).

*Bendalin v. Delgado,* 406 S.W.2d 897, 899 (Tex.1966); *Wiley v. Bertelsen,* 770 S.W.2d 878, 882 (Tex.App.—Texarkana 1989, no writ). Because the attorney-client relationship is contractual, the determination of the existence of a contract must be, as in any other contract case, based on an objective standard, and not on what the parties subjectively thought. *See Terrell,* 891 S.W.2d at 313. Without the requested instruction, the jury could find that V & E "agreed" to represent the beneficiaries if the beneficiaries merely testified, based on their subjective belief, that V & E had agreed. An instruction that fails to limit the jury's consideration to objective indications showing a meeting of the minds, and that allows the jury to base its decision, even in part, on a subjective belief is improper. It is not enough that one party thinks he has made a contract, there must be objective indications. *See Wiley,* 770 S.W.2d at 882. By failing to give the requested instruction, the court left the jury without guidance in determining whether V & E had agreed to render the legal services as claimed by Ann Moran and Jim Poinsett. Thus, the trial court erred in refusing to instruct the jury as requested.

■ Though we find the trial court abused its discretion in refusing to submit the instruction, we must still determine whether the court's error requires reversal. *See* TEX.R.APP. P. 81(b)(1). To determine whether an alleged error in the refusal or submission of instructions or definitions is reversible, the reviewing court must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986). Error in the jury charge is reversible only if, in light of the entire record, it was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Reinhart v. Young,* 906 S.W.2d 471, 473 (Tex.1995). We have reviewed the record and find the error was not reasonably calculated to cause and most likely did not cause the rendition of an improper judgment.

The evidence presented by appellees in support of their contention that an attorney-

client relationship existed was, primarily, based on V & E's statements and actions. These are the sort of "objective manifestations" considered necessary to support a finding that a contractual relationship existed between the parties. Though appellees did testify, based on their subjective beliefs, that an attorney-client relationship existed, most of the evidence presented was based on conduct or statements by V & E. Thus, because the majority of the evidence the jury considered was the evidence V & E desired it to consider through its requested instruction, we find the trial court's erroneous decision to refuse the instruction is not reversible error. We overrule point of error three.

**B. Consumer Status Under the DTPA**

■ In point of error four, V & E complains about the jury's finding that the beneficiaries were consumers under the DTPA. Whether a party is a consumer under the DTPA is a question of law. *Hand v. Dean Witter Reynolds, Inc.,* 889 S.W.2d 483, 496 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *Luker v. Arnold,* 843 S.W.2d 108, 111 (Tex.App.—Fort Worth 1992, no writ). The existence of the underlying facts that give rise to consumer standing, however, may be factual issues for the jury. *3Z Corp. v. Stewart Title Guar. Co.,* 851 S.W.2d 933, 937 (Tex.App.—Beaumont 1993, writ denied). In this case, the underlying facts necessary to determine whether the beneficiaries were consumers are not in dispute; rather, the dispute centers on the ultimate question. Therefore, we will review this issue not on the sufficiency of the evidence, but as a question of law.

■ To recover under the DTPA, the plaintiff must be a consumer. *Thompson,* 859 S.W.2d at 625. A DTPA consumer is "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM. CODE ANN. § 17.45(4) (Vernon 1987). For a person to qualify as a consumer he must meet two requirements. First, he must have sought or acquired the goods or services by purchase or lease, and second, the goods or services purchased must form the basis of

the complaint. *Hand*, 889 S.W.2d at 496 (citing *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex.1981)). Consumer status is dependent on the plaintiff's relationship to the transaction, not on the contractual relationship between the parties. *3Z Corp.*, 851 S.W.2d at 937. Therefore, a party need not show contractual privity with the opposing party to assert consumer status under the DTPA. *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 649 (Tex.1996); *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex.1983).

■ The DTPA is designed to protect consumers from any deceptive trade practice made in connection with the purchase or lease of any goods or services. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540–41 (Tex.1981). To this end, the supreme court has stated the DTPA must be given its most comprehensive application without doing any violence to its terms. *Id.* at 541. Although the DTPA is to be interpreted liberally, we are not persuaded that the Texas Legislature intended the Act to apply to causes of action by will beneficiaries against the attorneys hired by the executors of the estate.

Appellees argue we must find they are consumers in this case based on *Kennedy v. Sale*, 689 S.W.2d 890 (Tex.1985). In that case, the board of managers for Martin County Hospital District purchased an insurance policy for its employees. *Id.* at 891. The insurance agent, Sale, met with hospital employees to explain the new policy and its benefits. Id. After the policy went into effect, one of the hospital district's employees, Kennedy, underwent surgery for a pre-existing condition. *Id.* The insurance company paid only part of the medical bill and Kennedy filed suit under the DTPA alleging Sale had misrepresented the pre-existing condition coverage. *Id.*

The trial court rendered judgment for Kennedy, but the court of appeals reversed, holding that Kennedy was not a consumer as defined by the DTPA. *Id.* After granting petition for writ of error, the supreme court reversed the court of appeals finding that Kennedy did qualify as a consumer. *Id.* at 892. The supreme court held Kennedy "ac-

quired" the benefits of the new policy because he was covered by the policy's provisions. Kennedy was not required to directly purchase the policy to be a consumer. *Id.* Kennedy did "acquire" the policy benefits "by purchase" because the policy was purchased *for his benefit* by the hospital district's board of managers. *Id.* (emphasis added). The court held that to require a plaintiff to be a direct purchaser would be to read additional or different language into the DTPA in contravention of the Act's mandate of liberal construction. *Id.* Thus, the court held that when an employer purchases goods or services for the benefit of an employee, the employee has consumer status under the DTPA if the goods or services form the basis of his complaint. *See id.*

While the *Kennedy* decision gives some guidance on the issue presented in this case, its usefulness is limited. In *Kennedy*, the employer's primary purpose for purchasing the policy was to benefit the employees. The supreme court did not address consumer status in a situation in which the goods or services are purchased for the primary benefit of the actual purchaser, but incidentally benefit a third-party. We find the case of *Brandon v. American Sterilizer Co.*, 880 S.W.2d 488 (Tex.App.—Austin 1994, no writ), instructive, however.

In that case, Seton Medical Center purchased two gas sterilizers from American Sterilizer Company (AMSCO). *Id.* at 490. Brandon, a Seton employee, worked as a cardiopulmonary equipment specialist. *Id.* Part of her duties included loading hospital equipment into the gas sterilizers that used ethylene oxide, a toxic gas. *Id.* In 1984, Brandon arrived at work to find an AMSCO maintenance person working on one of the sterilizers. *Id.* After he left, the sterilizer began to leak and Brandon was exposed to toxic gas. *Id.*

Brandon brought suit against AMSCO for injuries resulting from her exposure to the toxic gas. *Id.* at 489. One of her claims was that AMSCO violated the DTPA, but the trial court granted AMSCO's motion for directed verdict on that claim because it found Brandon was not a consumer. *Id.* at 489–90. On appeal, the Austin Court of Appeals re-

viewed the supreme court's decision in *Kennedy,* but found that its usefulness was limited because it did not address whether an employee was a consumer if the good was not purchased for the employee's primary benefit. *Id.* at 491.

The Austin court agreed that an employee is entitled to consumer status when the goods or services are purchased for the primary purpose of benefitting the employee; however, when the goods or services are purchased for the primary purpose of benefitting the business, and any use or benefit of those products extends to the employee only incidentally, the employee does not have standing to sue under the DTPA. *Id.* at 492. Thus, the court found the relevant issue was the purpose behind the purchases of the goods or services. *Id.*

While this case does not involve a product or an insurance policy, we agree with the analysis used by the *Brandon* court and apply it to the facts of this case. Executors are entitled to employ attorneys to assist them in the administration of the estate. *Thomas' Estate v. Fullen,* 172 S.W.2d 118, 119 (Tex. Civ.App.—Beaumont 1943, writ ref'd). *See also Cunningham v. Parkdale Bank,* 660 S.W.2d 810, 812 (Tex.1983); *Tindall v. State,* 671 S.W.2d 691, 693 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.); TEX. PROB.CODE ANN. § 242 (Vernon 1980). It is the executors, not the beneficiaries, who are empowered to hire and consult with an attorney and to act on the attorney's advice on behalf of the estate. *See Huie* 922 S.W.2d at 925 (holding that trustee is empowered to hire attorney); TEX. PROB.CODE ANN. § 242 (Vernon 1980). The executors hire attorneys to represent themselves, not the beneficiaries, in carrying out the administration of the estate. *Id.*

In this case, the executors' purpose in hiring V & E was to obtain legal services for the administration of this large Estate. Any benefit of this "purchase" would obviously extend to the beneficiaries in the form of a more orderly administration. Any benefit derived by the beneficiaries, however, was merely incidental to the main purpose, i.e., legal assistance to the executors. We cannot conclude that the executors hired V & E for the principal purpose of providing a benefit

to the beneficiaries. *See Goldberg,* 266 Cal. Rptr. at 489. We find nothing to indicate that V & E's retention was in any respect different from the typical retention of counsel by the executor of a decedent's estate.

There are innumerable instances in modern practice in which services performed by an attorney will benefit others besides the client. For example, successful labor litigation on behalf of a union will benefit union members. *Goldberg,* 266 Cal.Rptr. at 489. Responsible representation of a city, county, or other governmental entity may confer an advantage on the citizens. *Id.* In these and other instances, the fortunes of third parties are affected by the performance of an attorney retained by a client. *Id.* The mere fact that these third parties are benefitted, or damaged, by the attorney's performance does not make the third parties consumers with rights to an action under the DTPA. These third parties are "incidental beneficiaries," and we do not believe the legislature intended to confer consumer status on them. Beneficiaries of a will or trust are, in this respect, no different; they may incidentally benefit or be damaged by the attorney hired to represent the executor. This does not give them consumer status under the DTPA.

Furthermore, we apprehend great danger in a rule that would confer consumer status on estate beneficiaries. The supreme court has recently reconfirmed the need for finality of probate proceedings. *See Little v. Smith,* 40 TEX. SUP.CT. J. 278 (1997). The state's interest in the prompt settlement of a decedent's affairs and in the finality of judgments distributing estates can constitute a sufficient basis for barring claims even though those claims may be meritorious. *Turner v. Nesby,* 848 S.W.2d 872, 877 (Tex.App.—Austin 1993, no writ). If consumer status were conferred on estate beneficiaries, the existence of minor beneficiaries, residual beneficiaries, or others similarly situated could extend the period of time in which an action could be brought against attorneys hired by the executors for years after the representation ended and the estate was closed. We find the public interest in the finality of probate proceedings includes actions against attorneys who represent executors in the

administration of the estate. A suit against an attorney would necessarily involve revisiting the original administration of the estate, and might very well affect the original distributions. Thus, public policy weighs against conferring consumer status on estate beneficiaries.

Appellees point to the supreme court's recent decision in *Arthur Andersen & Co. v. Perry Equip. Corp.*, 40 TEX. SUP.CT. J. 222 (1997), as authority for the proposition that the beneficiaries are consumers. We disagree. In that case, the court rejected the suggestion that a stock purchaser who reviews audited financial statements could bring a DTPA claim against the auditor because an external audit benefits them. *Id.* at 223. The court held that its holding in *Kennedy* was not so broad. *Id.* The court found the plaintiff was a consumer and allowed a DTPA action in the *Arthur Andersen* case because: (1) the plaintiff specifically requested the audit in question; (2) the accounting firm knew the plaintiff requested it and intended to rely on its accuracy; and (3) the accounting firm knew the purpose for which the audit was conducted. *Id.* Thus, the supreme court based its holding on specific conduct by the plaintiff. Here, the beneficiaries did not request the executors to hire V & E, nor is there any suggestion the beneficiaries intended to rely on V & E when they were first hired. We hold the beneficiaries were not consumers, and were not entitled to bring an action under the DTPA. V & E's fourth point of error is sustained.[18]

In point of error thirty-seven, V & E contends that, because there is no viable DTPA claim, the trial court erred in awarding attorneys' fees and additional damages under the DTPA. In the damage phase of the trial, the jury was asked in question sixteen what sum of money should be assessed against V & E as additional damages. The jury answered with the sum of $3,000,000.00. Under section 17.50 of the DTPA, a *consumer* who prevails is entitled to recover additional damages if the defendant acted knowingly. TEX. BUS. & COM.CODE ANN. § 17.50(b)(1) (Vernon Supp. 1997) (emphasis added). In this case, appellees were not "consumers," and therefore, not entitled to recover actual or additional damages under the DTPA. *See id.* Therefore, the trial court erred in awarding appellees $3,000,000.00 in additional damages.

The trial court also awarded appellees $6,900,000.00 in attorneys' fees.[19] According to the judgment, this amount represents one-third of the recovery of actual and additional damages. In Texas, attorney's fees may not be recovered from an opposing party unless such recovery is provided for by statute or by contract between the parties. *Travelers Indem. Co. of Connecticut v. Mayfield*, 923 S.W.2d 590, 593 (Tex.1996). Here, the only statute authorizing recovery of attorney's fees is the DTPA. *See* TEX. BUS. & COM.CODE ANN. § 17.50(d) (Vernon Supp.1997). Because we have determined appellees are not consumers, and therefore, cannot prevail under the DTPA, they are not entitled to attorneys' fees. *See id.* (stating that consumer who prevails shall be awarded costs and attorneys' fees). Thus, the trial court erred in awarding attorneys' fees to appellees. We sustain point of error thirty-seven.

---

**18.** In its fifth point of error, V & E raises another complaint concerning the jury's finding that the beneficiaries were consumers. In light of our decision in point of error four, we find it unnecessary to address V & E's other contention relating to consumer status under the DTPA.

**19.** We recognize the Texas Supreme Court recently held that to recover attorneys' fees under the DTPA, the plaintiff must prove that the amount of fees was both reasonably incurred and necessary to the prosecution of the case at bar, *and must ask the jury to award the fees in a dollar amount, not as a percentage of the judgment. Arthur Andersen & Co. v. Perry Equip. Corp.*, 40 TEX. SUP.CT. J. 222, 226 (January 10, 1997) (emphasis added). The court held that evidence of a contingent fee agreement alone cannot support an award of attorneys' fees under section 17.50(d) of the Texas Business and Commerce Code. *Id.* Finally, the court stated that trial court may no longer submit questions asking the jury to award a percentage of the DTPA recovery as a fee; rather, a question asking the jury to award a fee must ask the jury to award a specific dollar amount. *Id.*

While the trial court improperly submitted the attorneys' fee question as a percentage of recovery, it did so without the benefit of the court's opinion in *Arthur Andersen*. Moreover, because appellees are not consumers, they cannot recover actual damages, additional damages, or attorneys' fees under the DTPA.

## IV. DAMAGES AND THE JURY CHARGE

In point of error nine, V & E contends the evidence is insufficient to support the jury's damage findings in question thirteen. Though phrased as a sufficiency point, V & E's real contention in this point of error is that Ann Moran and Jim Poinsett cannot recover on their direct claims because there are no damage findings for them alone, as individuals; rather, the only damage findings are for the "plaintiffs."

V & E's argument in this point of error is directly related to its claim that legal malpractice claims cannot be assigned. In fact, point of error nine is a corollary to the firm's first point of error relating to assignments.

"Plaintiffs" was specifically defined in the charge as "Ann Moran and Jim Poinsett, Individually and in their capacities as Assignees of the claims of any other beneficiaries, trustees, executor, or administrator of the Moran Estate." In jury question thirteen, the jury was asked what sum of money, if any, would fairly and reasonably compensate the "plaintiffs" for the damages that resulted from V & E's conduct. Thus, based on the question and the definition of the term "plaintiffs," the jury was asked to award damages not only to Ann and Jim in their individual capacities, but also in their capacity as assignees.

In our discussion of point of error one, we held legal malpractice claims are not assignable as a matter of law. Based on this holding, it follows that Ann and Jim cannot recover damages as assignees; the assignments were invalid, and thus, they may recover, if it all, only in their individual capacities. The jury, however, was not asked what sum of money would compensate Ann and Jim for their damages as individuals. V & E specifically objected to the definition of "plaintiffs" as defined in the charge:

> Your Honor, Defendant Vinson–Elkins would next object to the definition of the term "plaintiffs" in the Court's Charge. That definition refers to the plaintiffs suing both in their capacity as assignees of the claims of other beneficiaries, of trustees, of executors and administrators of the Moran Estate, as well as any individual claims that they may have asserted.

> Your Honor, as a matter of law, for reasons that we have already argued to the Court in our Motion for Summary Judgment and in our Motion for Directed Verdict, there is no valid assignment of any causes of action that belong to any executors, any trustees or the administrators of the Estate. And since there is no valid assignment as a matter of law, the plaintiffs ought not to be—have any causes of action in their assignee capacities submitted to the jury.

The objection was overruled, and thus, the charge submitted was a "multiple-plaintiff" charge. The jury was instructed to find damages for four separate plaintiffs (Ann Moran individually; Ann Moran as assignee; Jim Poinsett individually; and Jim Poinsett as assignee) when, as a matter of law, there were only two (Ann Moran individually and Jim Poinsett individually). The charge did not ask or allow the jury to make any distinction between damages to be awarded to individuals versus assignees.

Because we have held the assignments invalid, neither Ann nor Jim can recover as assignees. The damages awarded by the jury were to Ann and Jim in both capacities. As submitted, it is impossible to determine how much the jury awarded to Ann and Jim on their individual or direct claims, and how much the jury awarded to them based on the assignments. This court cannot "carve out" damage findings for Ann and Jim individually. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986) (holding that appellate court has no power to find facts). We hold the trial court erred in rendering judgment for Ann Moran and Jim Poinsett because there are no damage findings for them alone. Therefore, we must reverse and remand this case for a new trial on damages *and liability.* A new trial is required for liability as well as damages because a separate trial on unliquidated damages alone is improper if liability issues are contested. Tex.R.App. P. 81(b)(1). We sustain point of error nine.

## V. SUFFICIENCY OF THE LIABILITY AND DISCOVERY RULE FINDINGS

In points of error twenty-six through thirty, V & E contends the evidence is legally and/or factually insufficient to support the jury's liability findings. In point of error thirty-three, the firm claims the evidence is legally and/or factually insufficient to support the jury's finding in question twelve that October 8, 1989, is the date appellees discovered the facts establishing the elements of their claim against V & E.

We note two things before we begin our review. First, we need not review points twenty-nine and thirty because they are liability findings under the DTPA. We have determined the beneficiaries, specifically Ann Moran and Jim Poinsett, are not consumers. Second, we need only review V & E's legally sufficiency complaints. If we sustain a factual sufficiency challenge, V & E is entitled only to a remand for a new trial. *See Ames v. Ames,* 776 S.W.2d 154, 158 (Tex.1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990) (holding that appellate court may reverse and remand for a new trial when evidence is factually insufficient).

In section IV of this opinion, we determined V & E was entitled to a new trial on liability and damages based on the definition of "plaintiffs." A finding favorable to V & E regarding its factual sufficiency claims would give V & E no more appellate relief than that already awarded. Therefore, we need only review V & E's legal sufficiency claims, i.e., claims entitling the firm to rendition rather than remand. *See Fifty–Six Thousand Seven Hundred Dollars in U.S. Currency v. State,* 730 S.W.2d 659, 661–62 (Tex.1987) (reversing and rendering because the trial court's finding was supported by "no evidence").

### A. Standard of Review

In reviewing a legal sufficiency claim, we consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Sherman,* 760 S.W.2d at 242. We must uphold the finding if there is more than a scintilla of evidence to support it. *Sted-* *man,* 595 S.W.2d at 488. If, however, the evidence is so weak as to create no more than a mere surmise or suspicion of the existence of the finding, the evidence is no more than a scintilla and is no evidence. *Kindred,* 650 S.W.2d at 63.

### B. Legal Sufficiency of the Liability Findings

In points of error twenty-six through twenty-eight, V & E claims there is no evidence to support the jury's liability findings in questions three through eight. Questions three and four asked whether V & E was negligent and grossly negligent in its handling of the legal matters for its clients relating to the Moran Estate. In jury questions five and six, the jury was asked whether V & E breached its fiduciary duties to its clients in handling the legal matters related to the Estate, and whether it did so to gain additional benefits for itself. In questions seven and eight, the jury had to determine whether V & E engaged in a civil conspiracy with First City, Seagull, Entex, and/or Wooten to breach its fiduciary duties to its clients, and whether it did so to gain additional benefits for itself.

The thrust of appellees' evidence was V & E's failure to reveal conflicts of interest and its failure to act in the best interest of the Estate, acting instead in its own interest. Appellees presented evidence showing that V & E's policy manual discouraged disclosure of conflicts of interest to clients, and that conflict issues were the domain of Attwell, the firm's managing partner. Appellees submitted evidence showing the conflicts system was rarely used by V & E, and furthermore, the system was inadequate because it referenced only representational conflicts, but did not list any of the firm's or any individual attorney's interests.

Appellees' evidence showed that, eventually, the beneficiaries discovered assorted conflicts of interest. There was testimony that V & E had not revealed these conflicts, and the conflicts affected major Estate transactions. Several of these conflicts involved Wooten, who was hired as president of the Moran Corporation after the Bank, one of the alleged co-conspirators, recommended

Wooten to Pat Moran and McDonough. Wooten involved a Moran company in a $3.2 million oil and gas venture with HOFCO, a company in which Wooten was a board member. One of V & E's attorneys, Cuclis, allegedly worked on some of the documentation for the venture.

HOFCO had serious financial problems and the Bank loaned the company approximately $5 million. V & E represented both HOFCO and the Bank in the loan transaction, and continued to represent HOFCO in other matters. Further, V & E owned stock in HOFCO, as did individual V & E attorneys. V & E never disclosed these potential conflicts.

Wooten also tried to involve the Moran Companies in a transaction with Entex. After he had a confidential conversation with Entex about Moran Utilities, Wooten and the Bank urged the Estate to contact Entex to discuss the possibility of a sale. Eventually, Entex made an offer, but several of the Moran family members formed a group and stated it would top all Entex offers. V & E represented the Estate in the negotiations and billed for the work.

Although many of the Estate beneficiaries knew the Bank favored the sale to Entex since the company was a large Bank customer, they eventually learned that the Bank made credit advances to Entex to allow the purchase. Attwell denied V & E had any relationship with Entex; however, Pat Moran found a limited partnership agreement, entered into before the Entex negotiations even began, in which the V & E Lawyers Retirement Plan and the Bank's pension trust were partners whose stated purpose was to buy Entex properties and lease them back to Entex.

Eventually, appellees learned that Wooten was recommended to the Bank by Cuclis' supervisor at V & E. The evidence showed that Wooten's tenure cost the Estate a large sum of money. Wooten was eventually terminated.

Appellees presented evidence of other conflicts that V & E did not disclose. V & E's plan for closing the Estate included the sale of Moran companies. The companies were to be sold to pay Estate taxes. The Moran family group still did not want to sell, but everyone agreed that if the companies were to be sold, a competitive bid system should be used. A bid system was set up for the purchase of Morgas and Moran Utilities. Offers were made by two companies, Seagull and Thrash, and a group of Moran family members. One or more appellees heard a rumor about a possible sale involving Seagull and Morgas. Ann Moran testified that she investigated the rumor that the purchase was "in the bag" and would "fall in the lap" of Seagull and the "senior partner" of V & E. V & E, however, told her there was nothing to it. Later, Seagull and its undisclosed partner, Entex, made a bid for the companies. V & E allegedly wanted to represent the Estate in the sale and sought a waiver of conflicts from the Estate after disclosing *only* that Seagull was a firm client. V & E disclosed no other conflicts.

Evidence was presented to show Seagull's offer was resisted by a majority of the beneficiaries. Pat Moran ultimately filed suit on May 20, 1988, to stop the two other executors, McDonough and the Bank, from making the sale. V & E represented to Pat Moran that it would not have any role in the executors' lawsuit; however, from memos obtained by appellees, V & E was involved behind the scenes. V & E recommended counsel for the Bank and the Bank's counsel was counting on V & E's "cooperation." Despite this, V & E continued to work for the Estate.

Eventually, appellees discovered numerous ties between V & E, the Bank, and Seagull, which the firm never disclosed. Attwell was on the board and executive committee of Seagull and was actively working for Seagull on the Morgas purchase. Attwell was actively involved in the firm's representation of the Estate and frequently consulted with the principal attorneys involved in the representation. Seagull officers served on the Bank's board and trust committee. Attwell and another V & E attorney, Harry Reasoner, served on the Bank's board; and many V & E attorneys owned stock in the Bank.

Appellees also presented evidence of V & E's "bad" advice regarding the federal estate tax deferral. V & E billed hundreds of hours

discussing and drafting plans to restructure the Estate's assets without triggering the loss of the tax deferral. V & E stated repeatedly that the deferral was in danger of acceleration by the IRS, and thus, Estate assets had to be maintained in short-term investments for purposes of availability. V & E warned that if the funds were not kept readily available, the Estate would be faced with a "liquidity crisis." The Bank joined in V & E's constant harping over this issue. Pat Moran was skeptical, but testified that he accepted and relied on V & E's expertise.

At trial, Arenson, one of appellees' experts, testified that he completely disagreed with V & E's advice about the "liquidity crisis," and asserted the chance of losing the deferral was essentially zero. The appellees' evidence showed there was no real justification for keeping the Estate's assets in short-term investments, which were less profitable to the Estate. Other evidence revealed that the only benefit from V & E's manufactured "liquidity crisis" was to the Bank, and it cost the beneficiaries millions.

Both of the experts proffered by Ann Moran and Jim Poinsett testified that V & E's conduct in handling the Estate was negligent, grossly negligent, and a breach of the firm's fiduciary duties. They testified that the nature, extent, and concealment of the conflicts of interest should have disqualified the firm from representing the Estate at all.

We have by no means detailed all of the evidence presented by appellees in this case. *See Ellis County State Bank v. Keever,* 888 S.W.2d 790, 794 (Tex.1994) (holding that appellate court is not required to detail all of the evidence when affirming a sufficiency challenge). But, under a legal sufficiency review, all we need to determine is whether the evidence presented is more than a scintilla. The evidence we have culled from the record and discussed in this opinion amounts to more than a scintilla, and we hold it is legally sufficient to support the jury's findings in questions three through eight. We overrule points of error twenty-six through twenty-eight.

## C. Legal Sufficiency and the Discovery Rule Finding

In point of error thirty-three, V & E claims the evidence is legally insufficient to support the jury's finding that October 8, 1989, was the date Ann Moran and Jim Poinsett discovered, or in the exercise of reasonable diligence, should have discovered, the facts establishing the elements of their claims against V & E. V & E claims the evidence establishes Ann and Jim knew or should have known about the nature of their injury more than two years before May 16, 1990, the date this suit was filed. Thus, V & E claims appellees' claims are barred by the two-year statute of limitations. *See Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988) (holding that two-year statute of limitation applies to legal malpractice claims); TEX. CIV. PRAC. & REM.CODE ANN. § 16.003(a) (Vernon Supp.1997).

The primary purpose of statutes of limitations is to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend while witnesses are available and the evidence is fresh in their minds. *Willis,* 760 S.W.2d at 644 (citing *Robinson v. Weaver,* 550 S.W.2d 18, 20 (Tex.1977)). For a suit to be timely under the two-year statute, it must be brought within two years following the date the cause of action accrues. TEX. CIV. PRAC. & REM.CODE ANN. § 16.003(a) (Vernon Supp.1997).

The discovery rule is the legal principle which, when applicable, provides that limitations run from the date the plaintiff discovers or should have discovered, in the exercise of reasonable care and diligence, the nature of the injury. *Willis,* 760 S.W.2d at 644. The discovery rule is applicable to legal malpractice actions. *Id.* at 646.

In response to a question by her attorney, Ann Moran testified that she began getting bits and pieces of information together concerning V & E's misconduct in the summer of 1988, after Pat Moran filed the executors' suit and some discovery material was produced. She stated that "it all came together" for her in the fall of 1989. She said she had enough information to suggest that a claim "should be pursued—or might

should be pursued" against V & E in September or early October of 1989.

Pat Moran, Ann Moran, and Jim Poinsett all testified about their efforts in attempting to discover the Bank's, and later, V & E's role in certain Estate relationships and transactions. V & E claims appellees knew "the nature of the injury" by early 1988. V & E points to evidence presented showing beneficiaries' concerns about expenses. Pat, Ann, and Jim, however, explained that these concerns reflected early suspicions about the Bank's misconduct and its "friendly" relationship with V & E. The appellees knew nothing specific, and none of the undisclosed conflicts that make up the great part of the evidence in this case had been discovered.

When Ann Moran heard rumors of a possible transaction involving Seagull and Attwell in March of 1988, she was told there was nothing to it, and that there were no negotiations with Seagull. The testimony shows that only after Pat Moran filed the executors' suit on May 20, 1988, did appellees even begin to discovery the alleged extensive, undisclosed conflicts in this case.

The jury apparently found October 8, 1989, as the date of discovery because that is the day Ann Moran wrote a lengthy letter to McDonough, outlining what the Moran family had learned about V & E's conduct and its role in the various Estate transactions. We find the evidence sufficient to support the jury's finding that Ann Moran and Jim Poinsett discovered, or in the exercise of reasonable diligence, should have discovered, the facts establishing the elements of their claims against V & E on October 8, 1989. We overrule point of error thirty-three.

## VI. CONCLUSION

Based on our decisions in the points of error discussed above, we find it unnecessary to address V & E's remaining contentions. We hold the assignments in this case were invalid, and as a result, the damage question was improperly submitted. On this basis, V & E is entitled to a reversal and remand for a new trial on liability and damages. Furthermore, we find there is sufficient evidence to support the existence of an attorney-client relationship between V & E and Ann Moran

and Jim Poinsett. Thus, Ann Moran and Jim Poinsett are entitled to re-try any individual claims that require the existence of an attorney-client relationship; however, Ann and Jim are not consumers as a matter of law, and therefore, they may not assert any DTPA claims against V & E upon retrial. As to Pat Moran, we hold he is an appellee, and because we have sustained his cross-point, he is entitled to assert any claims he may have against V & E in a new trial. The judgment of the trial court is reversed and rendered in favor of V & E on those claims brought by Ann Moran and Jim Poinsett, individually and as assignees, under the DTPA. The remainder of the judgment of the trial court is reversed and the case is remanded to the trial court for further proceedings in accordance with this court's opinion.