Reversed and Rendered and Opinion filed July 22, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00350-CV

___________________

 

InLiner Americas, Inc. n/k/a FirstLiner
Americas, Inc.; InLiner USA, Inc. n/k/a FirstLiner USA, Inc.; and CAT
Contracting, Inc., Appellants

 

V.

 

MaComb Funding Group, L.L.C.,
Appellee



 



 

On
Appeal from the 127th District Court

Harris County,
Texas



Trial Court Cause No. 2003-14181

 



 

 

OPINION

            After the appellants
defaulted on a secured loan and their creditor began proceedings to foreclose
on the collateral, the appellants assigned the collateral to the creditor.  Under
the terms of the parties’ agreements, the “collateral” was defined to include
all assignable causes of action the appellants owned or later acquired, as well
as the proceeds of such collateral.  In the central issue in this case, we are
asked to determine whether, as a result of the pledge and assignment, the
appellants transferred to the creditor unrelated legal-malpractice claims or the
funds appellants received to settle the claims.  We conclude that the malpractice
claims were not assignable; thus, it was not “collateral” as the parties
defined the term, and the settlement funds are not the proceeds of such
collateral.  We therefore reverse and render declaratory judgment in the appellants’
favor.  

I.  Factual and Procedural Background

            In 1990, Insituform Technologies, Inc. sued
appellants InLiner Americas, Inc. n/k/a FirstLiner Americas, Inc., InLiner USA,
Inc. n/k/a FirstLiner USA, Inc. (collectively, “InLiner”), and CAT Contracting
Inc. for patent infringement.[1] 
On September 30, 1995, the court ruled in Insituform’s favor on the issue of
liability.[2]


            On August 20, 1997, InLiner, CAT (collectively,
“the debtors”), and Gulio Catallo signed a promissory note in which they agreed
to pay MaComb Funding Group, L.L.C., the principal amount of $1.5 million at
the rate of 17.5 percent on or before July 1, 1999.  On the same day, the
parties signed a security agreement in which the debtors granted MaComb a
security interest in certain of their assets.  The parties referred to the
identified assets by the term, “Collateral,” which they defined to include, “to
the maximum extent same are assignable pursuant to the terms thereof, all . . .
causes of action . . . [and] [a]ll products and proceeds of
any and all of the foregoing Collateral.”  

            The debtors defaulted on the loan in July
1999, and on August 30, 1999, a federal court awarded Insituform damages in the
amount of $9,546,289.06.[3]


            MaComb filed suit on the loan in December
1999.  The following month, the parties entered into an agreed interlocutory judgment
in which the debtors acknowledged joint and several liability for all sums due
under the promissory note, as well as costs, attorneys’ fees, interest, and any
other expenses.  To prevent MaComb from executing on the judgment, the parties
entered into a Possession, Management, and Assignment Agreement (“PMA agreement”)
on June 22, 2000.  

            The PMA agreement provides in pertinent
part:

            WHEREAS, to date the Debtor has been unable to
pay and satisfy in full the Judgment, and so the parties have now agreed that
MaComb will conduct a “strict foreclosure,” in accordance with the laws of the
State of Texas, against the [collateral][[4]] and
the Debtor and in full satisfaction of the Judgment, except as herein stated:
in connection therewith, the Debtor has agreed to (i) transfer possession of
the [collateral] . . . to MaComb, (ii) manage, supervise, and maintain
such [collateral] for the benefit of MaComb, [and] (iii) defend, indemnify, and
save harmless MaComb in connection with all obligations, liabilities, claims,
causes-of-action, and/or losses which arise with respect to the [collateral]
during the “Term” . . . of this
Agreement . . . .

. . .

1.         Grant of Possession and Assignment of Leases:
[The debtors] hereby grant, sell, convey, transfer, and assign to MaComb all of
the [collateral] . . . .  Provided, however, MaComb does
not hereby assume any responsibility or obligation for any liabilities of [the debtors]
pertaining to such [collateral], except to the extent that MaComb hereafter
expressly assumes one or more of such liabilities in writing.  MaComb is deemed
herewith in lawful possession of such [collateral], subject to the terms,
conditions, and provisions of this Agreement.

            In 2003, InLiner, CAT, and Catallo
asserted legal-malpractice claims against the attorneys who represented them in
the federal patent litigation.[5] 
In 2005, InLiner and CAT also asserted a declaratory judgment action against
MaComb, seeking a declaration that MaComb did not acquire their legal-malpractice
claims through the PMA agreement.  MaComb asserted a counterclaim seeking a
declaration that it had acquired the malpractice claims.

            MaComb and the debtors filed
cross-motions for traditional summary judgment.  MaComb asserted that
(1) the debtors’ “assignment to MaComb of their rights in ‘all causes of
action’ and any resulting ‘proceeds,’ was part of a general assignment in a
commercial setting and transaction that encompasses a panoply of other assigned
rights, duties and obligations”; (2) the debtors’ “assignment to MaComb
does not violate Texas public policy and is enforceable because it does not
‘necessitate a duplicitous change in the positions taken by the parties in antecedent
litigation’ between them”; and (3) “MaComb is the lawful owner
of the Claims and entitled to the proceeds of any judgment or settlement of the
Claims.”  The debtors argued, inter alia, that any assignment of the legal-malpractice
claims or proceeds was void because such claims are not assignable as a matter
of law and public policy.

            The trial court denied the debtors’
summary-judgment motion and granted MaComb’s motion.  In a separate judgment,
it awarded MaComb attorneys’ fees in the amount of $40,372.30. 

            The debtors and MaComb brought an
interlocutory appeal, which we dismissed as untimely.  InLiner Americas,
Inc. v. MaComb Funding Group, L.L.C., 244 S.W.3d 427 (Tex. App.—Houston
[14th Dist.] 2007, pet. dism’d).[6] 
InLiner and CAT then settled their claims against the malpractice defendants,
and the trial court signed a final judgment.  This appeal ensued.

II.  Issues Presented

            The debtors present five issues on
appeal.  In their first issue, they contend that the trial court erred in granting
summary judgment in MaComb’s favor and denying their cross-motion for summary
judgment.  Their arguments in support of this position are set forth in their
remaining issues, half of which are based on the assertion that the parties’
agreements do not express an intent to pledge or assign their legal-malpractice
claims.  Specifically, the debtors assert in their second issue that their legal-malpractice
claims were not assigned because the cause of action did not exist when the
parties executed the security agreement in August 1997, and they argue in their
fourth issue that the security agreement does not identify the causes of action
included in the collateral with reasonable certainty.  In their remaining
arguments, the debtors contend that any purported pledge and assignment of
their malpractice claims is unenforceable.  In particular, they contend in their
third issue that the assignment must fail because the debtors did not surrender
all control over the legal-malpractice claims, and they argue in their fifth
issue that the assignment of such claims is contrary to nationwide policy and
Texas precedent.  

III.  Standard of Review

            In a traditional motion for summary
judgment, the movant has the burden of showing that there is no genuine issue
of material fact and it is entitled to judgment as a matter of law.  Tex. R. Civ. P. 166a(c); Am. Tobacco
Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997).  To be entitled to
traditional summary judgment, a defendant must conclusively negate at least one
essential element of each of the plaintiff’s causes of action or conclusively
establish each element of an affirmative defense.  Id.  Evidence is
conclusive only if reasonable people could not differ in their conclusions.  City
of Keller v. Wilson, 168 S.W.3d 802, 816 (Tex. 2005).  When both parties
move for summary judgment and the trial court grants one motion and denies the
other, we review the summary-judgment evidence presented by both sides,
determine all questions presented, and render the judgment the trial court
should have rendered.  Tex. Workers’ Compensation Comm’n v. Patient
Advocates of Tex., 136 S.W.3d 643, 648 (Tex. 2004) (citing FM Props.
Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000)).  

IV.  Analysis

            The dispositive issues presented in this appeal
require us to answer two questions.  First, do the agreements express an intent
to pledge and transfer all assignable causes of action and their proceeds?  And
if so, are the legal-malpractice claims such assignable causes of action?  We
begin our analysis with the debtors’ arguments concerning the terms of the
parties’ agreements.   

            Our primary concern in interpreting a contract is
to ascertain the true intent of the parties as expressed in their agreement.  Seagull
Energy E & P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex.
2006).  Generally, the writing alone is sufficient to express the parties’
intentions, “for it is objective, not subjective, intent that controls.”  Matagorda
County Hosp. Dist. v. Burwell, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam)
(quoting City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d
515, 518 (Tex. 1968)).  We therefore examine the writing as a whole to
harmonize all of its provisions so that none will be rendered meaningless.  J.M.
Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003); Coker v.
Coker, 650 S.W.2d 391, 393 (Tex. 1983).  We presume that the parties to a
contract intend every clause to have some effect.  Heritage Res., Inc. v.
NationsBank, 939 S.W.2d 118, 121 (Tex. 1996).  Thus, no single provision is
given controlling effect, and all provisions are considered with reference to
the entire contract.  J.M. Davidson, 128 S.W.3d at 229.  In analyzing
the contract, we give terms their plain, ordinary, and generally accepted
meaning unless the contract shows the parties used them in a technical or
different sense.  Heritage Res., 939 S.W.2d at 121; see also
Hewlett-Packard Co. v. Benchmark Elecs., Inc., 142 S.W.3d 554, 561 (Tex.
App.—Houston [14th Dist.] 2004, pet. denied) (“We construe a contract from a
utilitarian standpoint, bearing in mind the particular business activity sought
to be served.”).  We determine how the “reasonable person” would have used and
understood the contract’s language, considering the circumstances surrounding its
negotiation and keeping in mind the purposes intended to be accomplished by the
parties when entering into the contract.  Nat’l Union Fire Ins. Co. of
Pittsburgh, Pa. v. Ins. Co. of N. Am., 955 S.W.2d 120, 127–28 (Tex.
App.—Houston [14th Dist.] 1997), aff’d sub nom. Keck, Mahin &
Cate v. Nat’l Union Fire Ins. Co. of Pittsburgh, Pa., 20 S.W.3d 692, 704
(Tex. 2000).

A.        Scope of the Parties’ Agreements

            The debtors first contend that the security
agreement is limited in both scope and time.  Specifically, they argue that the
security agreement “provides the date—August 20, 1997—of the parties’ intent as
to what they included as security,” and contend that the legal-malpractice
claims are not included because they did not exist before August 31, 1999, when
judgment was entered against them in the patent-infringement case.  In support
of this argument, the debtors purport to quote the security agreement as
providing that each debtor granted to MaComb “a lien or security interest in,
all such Debtor’s right, title and interest in . . . the following (the ‘Collateral’).” 
This statement is then followed by an itemized list of those assets pledged to
secure the loan; the legal-malpractice claims are not included in the list.

            The debtors’ argument, however, is based
on selective editing of the security agreement.  This section actually provides
as follows: 

The Debtors hereby grants [sic] to the Secured Party a lien
or security interest in, [sic] all of such Debtors’s [sic] right, title and
interest in and to all of the following assets of the Debtors, now owned
or hereafter acquired, except as otherwise excluded on Schedule I
hereto, including, without limitation, the following (the “Collateral”)
. . . .

(emphasis added).  We cannot ignore the language emphasized
above.  See McMahan v. Greenwood, 108 S.W.3d 467, 484 (Tex. App.—Houston
[14th Dist.] 2003, pet. denied) (explaining that the intention of the parties to
an agreement can be ascertained “only by looking at the entire contract”).  The
debtors contend their legal-malpractice claims accrued in August 1999, and they
asserted in their summary-judgment motion that the claims “constitute
after-acquired property.”  The claims therefore are encompassed within the
plain meaning of “all causes of action” that were “hereafter acquired.”  Accordingly,
we overrule the debtors’ second issue.

            Arguing that the security agreement is a
release to which the fair-notice requirements of the express-negligence rule
apply, the debtors also contend that their legal-malpractice claims are not
identified with reasonable certainty, and thus, their assignment is
unenforceable.  Because this argument was not raised in the summary-judgment
proceedings, it has not been preserved for our review.  See Tex. R. App. P. 33.1(a)(1)(A); Tex. R. Civ. P. 166a(c).  We therefore overrule
the debtors’ fourth issue.  See City of Houston v. Clear Creek Basin Auth.,
589 S.W.2d 671, 678 (Tex. 1979) (holding that summary judgments cannot be
reversed on grounds that were not presented to the trial court).

            We conclude that, under the unambiguous
terms of the parties’ agreements, the debtors’ legal-malpractice claims are among
the causes of action conveyed to MaComb “to the maximum extent same are
assignable.”  

B.        Assignability of the Legal-Malpractice
Claims

            The determination of assignability is a
matter of both precedent and policy.  See Izen v. Nichols, 944
S.W.2d 683, 685 (Tex. App.—Houston [14th Dist.] 1997, no writ).  Because the
parties’ disagreement focuses primarily on the actual holdings of prior cases,
we begin by addressing these arguments.

            1.         Mallios v. Baker

            In Texas, assignments of legal-malpractice
claims arising from litigation generally are invalid.  Zuniga v. Groce,
Locke & Hebdon, 878 S.W.2d 313, 318 (Tex. App.—San Antonio 1994, writ
ref’d); Vinson & Elkins v. Moran, 946 S.W.2d 381, 395 (Tex.
App.—Houston [14th Dist.] 1997, writ dism’d by agr.); Baker v. Mallios,
971 S.W.2d 581, 584 (Tex. App.—Dallas 1998), aff’d on other grounds, 11
S.W.3d 157 (Tex. 2000).  The debtors assert, and MaComb does not dispute, that
the legal-malpractice claims at issue arose from litigation.  See Tex. R. App. P. 38.1(g).  Citing Mallios
v. Baker, MaComb instead argued, both in its summary-judgment motion and on
appeal, that “a majority of the Texas Supreme Court has endorsed the validity
of assignments of malpractice claims as part of a general assignment in a
commercial setting.”  This is incorrect.  

            In Mallios, a client, Baker,
obtained a $1 million default judgment against an alleged tortfeasor.  11
S.W.3d at 158.  Baker then answered the advertisement of a third party, Herron,
offering to buy judgments.  Id.  Herron concluded that Baker’s attorney,
Mallios, had sued the wrong person.  Id.  In exchange for Herron’s assistance
in pursuing a legal-malpractice claim, Baker assigned Herron half of any net
recovery.  Id.  Baker sued Mallios, and Mallios successfully moved for
summary judgment on the ground that Baker’s legal-malpractice claim was barred
because Baker violated public policy by assigning the claim to Herron.  Id. at
158–59.  

            The Texas Supreme court did not reach the
question of whether an assignment under these or any other circumstances violated
public policy.  Id. at 159.  Rather, the court held that Mallios was not
entitled to a take-nothing judgment regardless of whether the assignment
violated public policy, because Baker agreed to assign only part of his claim. 
Id.  The court expressed no view on the validity of “the assignment of a
legal malpractice claim as part of a general assignment in a commercial setting”—a
question that was not presented—and declined to rule on the validity of the
only assignment actually before it.

            Given the holding in the case, a
statement by the court that the assignment did or did not violate public policy
would have been dictum.  And although we have stated that “[j]udicial dictum, a
statement by the supreme court made very deliberately after mature
consideration and for future guidance in the conduct of litigation, is ‘at
least persuasive and should be followed unless found to be erroneous,’”[7] the Mallios decision
contains no such statement.  Justice Hecht, writing on behalf of four members
of the court, concurred with the majority, but would have held that commercial
marketing of a legal-malpractice claim violates public policy.  As he
explained, “the vice is not in a mere assignment of part of plaintiff's
recovery, but in an assignment coupled with such control that the third party
assignee has a commercial investment in the outcome and the power to protect
it.”  Id. at 160 (Hecht, J., concurring).  In a second concurring
opinion on behalf of two members of the court, Justice Enoch joined in the majority’s
opinion, but wrote separately to clarify that, had the issue been reached, he
would have held that the commercial marketing of legal-malpractice claims does
not violate public policy.[8] 
The remaining three members of the majority expressed no opinion on the
subject.  Thus, the view endorsed by the majority of the Mallios court
is no more and no less than that stated in the majority opinion.  Contrary to
MaComb’s argument, no Texas court has held that a legal-malpractice claim is
assignable in circumstances analogous to those presented here.  Although there
are circumstances, inapplicable here, in which a malpractice claim may be
litigated by someone other than the client, the general rule is that policy
concerns prohibit the assignment of legal-malpractice claims.[9]  

            2.         Policy Considerations

            The parties’ summary-judgment and
appellate arguments have addressed the trial court’s ruling in terms of policy
as well as precedent.  See Izen, 944 S.W.2d at 685 (evaluating an
assignment in light of the policy considerations raised in Zuniga and
similar cases).  Whether a contract violates public policy is a question of
law, which we review de novo.  Lawrence v. CDB Servs., Inc., 44 S.W.3d
544, 555 (Tex. 2001), superseded by statute on other grounds as stated in
Storage & Processors, Inc. v. Reyes, 134 S.W.3d 190, 192 (Tex. 2004).  

            According to MaComb, the assignment of a
legal-malpractice claim is unenforceable only if it violates public policy by “necessitat[ing]
a duplicitous change in the positions taken by the parties” in the underlying
litigation.  Although that is one reason for refusing to enforce such an
assignment, this is not the only policy concern addressed in Zuniga and
its progeny.  Texas courts have identified many reasons why the harm caused by
the assignment of a legal-malpractice claim outweighs its benefits.  Among
other things, assignment of legal-malpractice claims could lead to commercial
marketing of claims,[10]
substitution of a malpractice claim for a claim against an insolvent defendant,[11] discouragement of
voluntary settlement agreements,[12]
compromise of client confidentiality,[13]
and weakening of the attorney’s duty of loyalty.[14]  Some of these
concerns apply here.

            In particular, the Zuniga court
cautioned that “assignability would make possible the commercial marketing of
legal-malpractice causes of action by strangers, which would demean the legal
profession.”  Zuniga, 878 S.W.2d at 316.  If the malpractice claims in
this case were assignable, then they formed part of the collateral identified
in the security agreement, in which the parties specifically agreed that in the
event of default, MaComb could “sell the collateral or any part thereof in one
or more parcels at public or private sale, at any of [MaComb]’s offices or
elsewhere, for cash or on credit, and upon such other terms as may be
commercially reasonable.”[15] 
Thus, treating the malpractice claims like the debtors’ other assets as MaComb
suggests would lay the groundwork for the kind of commercial marketing
criticized by the Zuniga court.  And although MaComb argues that it is
not a stranger to the legal-malpractice claims at issue,[16] the result would
be no less demeaning to the legal profession.  

            The Zuniga court also cautioned
that a plaintiff with a claim against an insolvent defendant “has every incentive
to look elsewhere for a source of funding” and could offer
to waive collection from the defendant in return for assignment of the right to
sue the defendant’s lawyer.  Id. at 317.  This is very like the
situation presented in this case: MaComb is a judgment creditor, and the debtors’
pledged assets were assigned to avoid execution of the judgment.  In
arguing for assignment of the malpractice claims, MaComb seeks to substitute
the attorneys for an insolvent debtor.

            MaComb analogizes the assignment of the
claims to the purchase of a business.  There are, however, important
distinctions.  Although many of the debtors’ assets were assigned to MaComb,
the debtors managed the assets subject to MaComb’s direction and remained responsible
for any liabilities arising in connection with them.[17]  Thus, if the legal-malpractice
claims were assigned, then MaComb could direct the debtors to manage the
malpractice litigation in a manner that risked sanctions, knowing that such liabilities
would be borne by the debtors alone.  See Mallios, 11 S.W.3d at 169
(Hecht, J., concurring).  This would undermine the deterrent effect that
sanctions are intended to serve.  See Cire v. Cummings, 134 S.W.3d 835,
839 (Tex. 2004).

            In sum, we conclude that both precedent
and policy prohibit the assignment of the debtors’ malpractice claims.  Here,
as in Zuniga, the costs to the legal system of such an assignment
outweigh its benefits.  See Zuniga, 878 S.W.2d at 318.    

C.        Assignability of Proceeds  

            MaComb argues that the debtors failed to
address MaComb’s distinct legal rights to any “proceeds” of the malpractice
claims, and thus, it has a right to any funds paid to the debtors to settle
such claims.  We disagree.  In its pleadings and its summary-judgment motion
and response, MaComb asserted a right to the settlement funds only as the
proceeds of the legal-malpractice claims, not as a distinct asset independent
of such claims, and MaComb has an interest in InLiner’s causes of action only
if they are encompassed within the meaning of “collateral” as the parties
defined that term.  See Grohman v. Kahlig, 53 Tex. Sup. Ct. J. 964, 2010
WL 2635879, at *3–4 (Tex. July 2, 2010) (per curiam) (relying on the parties’
definition of “collateral” in evaluating whether a security interest was
affected by the conversion of corporate shares into units of a limited
partnership).  Under the agreement, “collateral” includes “all causes of
action,” but only “to the maximum extent they are assignable.”  Thus, because
the legal-malpractice claims are not assignable, that cause of action is not
included within the definition of collateral.  Proceeds are collateral only if
they are proceeds “of the foregoing [c]ollateral.”  Therefore, because the
legal-malpractice claims are not collateral, proceeds from the claims are not
collateral either. MaComb’s security interest in a claim’s “proceeds” is
determined by the assignability of the cause of action and is unaffected by the
exchange of the cause of action for settlement funds.  Cf. id. (where
parties defined “collateral” to include shares of corporate stock and all
replacements, substitutions, and proceeds of the shares, the shares retained
their character as collateral even though they “changed form” into partnership
units).  Thus, the debtors appropriately argued in their summary-judgment
motion and response that because the legal-malpractice claims were not
assignable, neither the claims nor any proceeds from the claims were validly
assigned to MaComb.  

            We sustain the debtors’ first and fifth
issues.[18]

V.  Conclusion

            Because the debtors’ legal-malpractice
claims were not assignable, the trial court erred in denying their
summary-judgment motion and granting summary judgment and attorneys’ fees to
MaComb.  We therefore reverse the trial court’s judgment and declare that the debtors’
legal-malpractice claims and the proceeds of such claims were neither pledged
nor assigned to MaComb.[19] 


 

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel consists of Justices
Yates, Seymore, and Brown.

 









[1] See Insituform Techs.,
Inc. v. CAT Contracting, Inc., 99 F.3d 1098 (Fed. Cir. 1996), cert. denied,
520 U.S. 1198, 117 S. Ct. 1555, 137 L. Ed. 2d 703 (1997), appeal after remand,
113 F.3d 1258 (Fed. Cir. 1997), appeal after remand, 161 F.3d 688 (Fed.
Cir. 1998), cert. denied, 526 U.S. 1018, 119 S. Ct. 1254, 143 L. Ed. 2d
350 (1999), on remand, No. Civ.A.H-90-1690, 1999 WL 33914622 (S.D. Tex.
Aug. 30, 1999) (not designated for publication), rev’d in part and vacated
in part, 10 F. App’x 871 (Fed. Cir. 2001) (not designated for publication),
vacated, 535 U.S. 1108, 122 S. Ct. 2322, 153 L. Ed. 2d 151 (2002), on
remand, 81 F. App’x 320 (Fed. Cir. 2003) (not designated for publication), after
reinstatement of appeal, 87 F. App’x 180 (Fed. Cir. 2004) (not designated
for publication), after remand, 385 F.3d 1360 (Fed. Cir. 2004), on
remand, 518 F. Supp. 2d 876 (S.D. Tex. 2007).





[2] Insituform, 518 F.
Supp. 2d at 880.





[3] Insituform, 1999
WL 33914622, at *32.





[4] In the PMA agreement, the
parties noted that InLiner’s assets, “which are described in the Security
Agreement and the various UCC Financing Statements executed and filed in
connection therewith, were pledged as security for the payment and performance
of the Debtor under the Note and Loan Agreement.”  In other words, the
“Assets,” as that term is used in the PMA agreement, are the same as
“Collateral,” as that term is defined in the security agreement.  For clarity,
we refer to all such property and rights as “collateral.”





[5] These defendants include
Edward W. Goldstein, Susan K. Knoll, and the firms with which they each have
been affiliated: Arnold, White & Durkee, L.L.P.; Arnold, White &
Durkee, Corp.; Howry, Simon, Arnold & White, L.L.P.; and Goldstein &
Polasek. 





[6] The Texas Rules of
Appellate Procedure were subsequently amended, and as rewritten, Rule 28.2 now
permits a notice of an agreed appeal to be filed up to twenty days after the
trial court signs an order granting the parties permission to appeal.  See Tex. R. App. P. 28.2(a).





[7] Edwards v. Kaye, 9
S.W.3d 310, 314 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (quoting Palestine
Contractors, Inc. v. Perkins, 386 S.W.2d 764, 773 (Tex. 1964)); but see Jama
v. Immigration & Customs Enforcement, 543 U.S. 335, 351 n.12, 125 S.
Ct. 694, 706 n.12, 160 L. Ed. 2d 708 (2005) (“Dictum settles nothing, even in
the court that utters it.”).  





[8] Although the debtors have
repeatedly pointed out changes in the membership of the Texas Supreme Court
since Mallios was decided, such factors can play no part in our review. 
Changes in personnel are not changes in precedent, and judicial decisions must
be “founded in the law rather than in the proclivities of individuals.”  See
Vasquez v. Hillery, 474 U.S. 254, 265, 106 S. Ct. 617, 624, 88 L. Ed. 2d
598 (1986) (explaining the role of stare decisis); Weiner v. Wasson, 900
S.W.2d 316, 320 (Tex. 1995) (observing that “the legitimacy of the judiciary
rests in large part upon a stable and predictable decisionmaking process that
differs dramatically from that properly employed by the political branches of
government”).





[9] See, e.g., Fairfield
Ins. Co. v. Stephens Martin Paving, LP, 246 S.W.3d 653, 665 & n.20
(Tex. 2008) (stating that “this Court has held in a number of cases over the
years that public policy clearly disfavors certain types of agreements” and
citing Zuniga with the parenthetical “holding that assignment of legal
malpractice claims was against public policy”);
State v. Oakley, 227 S.W.3d 58, 61 & n.19 (Tex. 2007) (citing Zuniga
with the parenthetical “rejecting assignment of legal malpractice claim”); PPG
Indus., Inc. v. JMB/Houston Ctrs. Partners L.P., 146 S.W.3d 79, 87 n. 31
(Tex. 2004) (describing Zuniga’s holding as “prohibiting assignment of
legal malpractice claims”).





[10] Zuniga, 878
S.W.2d at 316.





[11] Id. at 317.  





[12] Wright v. Sydow,
173 S.W.3d 534, 553 (Tex. App.—Houston [14th Dist.] 2004, pet. denied).





[13] See Moran, 946
S.W.2d at 394.





[14] Mallios, 11
S.W.3d at 165 (Hecht, J., concurring).





[15] Although the parties do
not contend that MaComb would attempt to sell the claims, “our decision must
apply to cases generally.”  Zuniga, 878 S.W.2d at 317.  





[16] We express no opinion on
this.





[17] This right is addressed
in the PMA agreement as follows:

Management of [Collateral]: During the Term of
this Agreement, Debtor, jointly and severally, shall be fully responsible for
managing and operating the [collateral] in accordance with its past practices,
and in the ordinary care of the business operations of the Debtor, provided
that MaComb may at any time advise Debtor in writing of a required change in
such management and business practices, and Debtor shall immediately conform
its management services and practices to that stated in the MaComb notice of
change. . . .  Debtor, jointly and severally, specifically agree[s] to
defend, indemnify, and save harmless MaComb from any and all claims,
losses, causes-of-action, obligations, and/or liabilities which may arise in
connection with the . . . management of the [collateral],
the [collateral], and/or complying with the terms and
conditions of this Agreement. . . .  (emphasis added).





[18] We do not reach the
debtors’ third issue.





[19] The debtors have not
sought an award of attorneys’ fees; thus, no remand is necessary.